LEWIS, J.
In this case, we review the decision of the Fifth District Court of Appeal reported as Wallace v. Dean, 970 So.2d 864 (Fla. 5th DCA 2007). Despite the plaintiff-petitioner’s repeated reliance upon the undertaker’s doctrine below, which is readily apparent from reading the Fifth District’s decision,[1] that court failed to recognize a long line of Florida precedent applying this common-law doctrine to governmental actors and entities.[2] Of particular significance is the First District’s decision in *1039 Hartley v. Floyd, 512 So.2d 1022 (Fla. 1st DCA 1987), which applied the undertaker’s doctrine and held that a common-law duty-existed when a sheriffs deputy assured a 911 caller that he would conduct a safety check (and later claimed that he did conduct such a check) when, in fact, he never responded to the scene. See id. at 1024 (relying upon Dep’t of Highway Safety & Motor Vehicles v. Kropff, 491 So.2d 1252 (Fla. 3d DCA 1986), and Padgett v. Sch. Bd. of Escambia County, 395 So.2d 584 (Fla. 1st DCA 1981)).
As we explained long ago in Nielsen v. City of Sarasota, 117 So.2d 731, 734 (Fla.1960), and subsequently reaffirmed following the 1980 amendments to article V of the Florida Constitution,[3] there are two principle circumstances that support our jurisdiction to review district-court decisions based upon alleged express-and-direct conflict.[4] Here, we deal with both species of conflict jurisdiction identified in Nielsen. First, the decision below announced a rule of law that conflicts with the host of decisions listed in footnote 2, supra. Second, the decision below conflicts with Hartley v. Floyd, 512 So.2d 1022 (Fla. 1st DCA 1987), because each decision involved the substantially similar factual scenario of an allegedly negligent law-enforcement response to a safety check, which the respective plaintiffs contended increased the risk of harm to their decedents. Hence, the attempt of our dissenting colleagues to narrow our recognized conflict jurisdiction to solely encompass decisions involving identical factual scenarios is based upon an unjustified departure from existing precedent, which fails to recognize the first species of conflict jurisdiction identified in Nielsen and unjustifiably attempts to erode the second.[5]
*1040 In addition to the jurisdictional bases described in Nielsen, conflict jurisdiction also exists here based upon misapplication of our decisions in Kaisner v. Kolb, 543 So.2d 732 (Fla.1989), Everton v. Willard, 468 So.2d 936 (Fla.1985), and Trianon Park Condominium Association v. City of Hialeah, 468 So.2d 912 (Fla.1985).[6] First, in opposition to Kaisner, the decision below improperly conflated the separate questions of duty and sovereign immunity by holding that the deputies in this case were engaged in a “discretionary” function (i.e., a question related to whether the doctrine of sovereign immunity applies) and then perplexingly stating that it “need not discuss the issue of sovereign immunity.” Wallace, 970 So.2d at 867-69. Second, the decision below misapplied Ever-ton, as we expressly limited our holding in that case to the question of whether a law-enforcement officer’s decision to make an arrest or to enforce the criminal law is a discretionary function insulated from tort liability by the doctrine of sovereign immunity. See Wallace, 970 So.2d at 867, 868. Third and finally, the decision below misapplied Trianon by classifying the affirmative response of the Sheriffs deputies involved in this case as a category II activity when, in reality, this type of response falls within category IV of the Trianon taxonomy. See Wallace, 970 So.2d at 867.
We thus possess and exercise our discretionary conflict jurisdiction to resolve the question of whether the undertaker’s doctrine applies to governmental officers who have affirmatively responded to a 911 call, actually engaged an individual, and undertaken to perform a safety check. See art. V, § 3(b)(3), Fla. Const. As explained in our analysis, we quash the decision of the Fifth District in Wallace, and conclude that the undertaker’s doctrine applies when law-enforcement officers respond, actually engage an injured party, and then undertake a safety check, which places the injured party in a “zone of risk”[7] because the officers either increased the risk of harm to the injured party or induced third parties — who would have otherwise rendered aid — to forebear from doing so. See Restatement (Second) of Torts §§ 323-324A (1965) (articulating the common-law undertaker’s doctrine).[8] Under these circumstances, we further hold that the affirmative actions of the deputies involved in this case were operational in nature; therefore, sovereign immunity does not bar the plaintiff-petitioner’s negligence-based wrongful-death claim. See § 768.28(1),(5), Fla. Stat. (2004); Slemp v. City of N. Miami, 545 So.2d 256, 257 (Fla.1989) (“The abiding test for determining whether a government entity has sovereign immunity for its *1041 tortious acts is the operational/planning formula set forth in Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla.1979).”).
I. BACKGROUND
Plaintiff-petitioner, Kelly Wallace (the decedent Brenda Wallace’s daughter), originally filed an action pursuant to Florida’s Wrongful Death Act (sections 768.16-.26, Florida Statutes (2004)), against Ed Dean in his official capacity as the Sheriff of Marion County. In the initial complaint, the plaintiff alleged that two Marion County Sheriffs deputies responded to a 911 call, undertook to determine Brenda’s safety, thereby assumed a duty of care, and negligently increased the risk of harm that Brenda faced by failing to summon an ambulance, which proximately resulted in Brenda’s death. After two subsequent amendments, which (i) added additional factual information concerning these events (i.e., Brenda was totally unresponsive to the deputies’ repeated and concerted attempts to physically and verbally awaken her) and (ii) further alleged that the deputies “rebuffed” the suggestions of third parties that Brenda was in a diabetic coma and that the deputies should summon an ambulance, the circuit court dismissed the plaintiffs complaint with prejudice for failure to state a cause of action. See Fla. R. Civ. P. 1.140(b)(6). To support its order of dismissal, the circuit court provided the following legal bases: (1) the Sheriff did not owe the plaintiffs decedent a common-law duty of care; (2) by responding to the 911 call and conducting a safety check, the Sheriffs deputies were performing a quasi-legislative discretionary function for which the Sheriff enjoys sovereign immunity; (3) the court was concerned with a hypothetical “chilling effect” that liability might have on the Sheriffs future willingness to conduct safety checks;[9] and (4) the deputies never created a “special relationship” with the decedent or the plaintiff, which otherwise could have subjected the Sheriff to liability. Thereafter, the plaintiff-petitioner filed a timely notice of appeal with the Fifth District.
On appeal, the plaintiff-petitioner repeatedly invoked the undertaker’s doc *1042 trine as a recognized common-law basis for imposing a duty of care and also highlighted the fact that this case (in marked contrast to our prior decision in Everton v. Willard, 468 So.2d 936 (Fla.1985)) [10] does not involve the discretionary decision of whether to arrest a suspect or whether to enforce the law; instead, it involves the affirmative provision of a service to a determinate individual (i.e., actually engaging and conducting a service upon the individual). Nevertheless, the Fifth District affirmed the circuit court’s final order of dismissal by employing much of the same reasoning and by characterizing the deputies’ actions as passive nonfeasance (rather than active negligence), which, according to the district court, at most exhibited “poor judgment.” See Wallace, 970 So.2d at 867-69. While we do not reach the question of whether the deputies ultimately breached the applicable standard of care in this case,[11] we note that even “poor judgment” may result in negligence:
A failure to conform to the standard [of care] is negligence, therefore, even if it is due to clumsiness, stupidity, forgetfulness, an excitable temperament, or even sheer ignorance. An honest blunder, or a mistaken belief that no damage will result, may absolve the actor from moral blame, but the harm to others is still as great, and the actor’s individual standards must give way in this area of the law to those of the public. In other words, society may require a person not to be awkward or a fool.
Prosser and Keeton on the Law of Torts § 31, at 169 (W. Page Keeton, et al. eds., 5th ed.1984) (footnotes omitted).
In addition to misconstruing Florida law, the reasoning exhibited below improperly discounted the appropriate standard of review: “For ... purposes of a motion to dismiss for failure to state a cause of action, allegations of the complaint are assumed to be true and all reasonable inferences arising therefrom *1043 are alloived in favor of the plaintiff.” Ralph v. City of Daytona Beach, 471 So.2d 1, 2 (Fla.1983) (emphasis supplied) (citing Orlando Sports Stadium, Inc. v. State ex rel. Powell, 262 So.2d 881 (Fla.1972); Popwell v. Abel, 226 So.2d 418 (Fla. 4th DCA 1969)). Bearing this standard in mind, the plaintiff-petitioner’s second amended complaint reveals several material facts. Kelly Wallace, who was then outside the state of Florida, placed several phones calls to her mother Brenda’s Florida home, which inexplicably were unanswered. Kelly then contacted Marjorie Ginder, Brenda’s neighbor, to ascertain whether Brenda was safe. Ginder agreed to do so and to dial 911 if necessary.[12] Ginder then proceeded next door to Brenda’s home and repeatedly knocked on its doors and windows. Because there was no response, Ginder dialed 911. Two Marion County Sheriffs deputies responded to the call and arrived to aid Brenda. Upon arrival, Ginder provided the deputies with background information concerning Brenda’s situation. One of the deputies actually entered the home through an unlocked window and allowed the other deputy, Ginder, and Ginder’s father to enter. The deputies found Brenda lying in a makeshift bed in her living room. She was breathing but totally unresponsive. In an attempt to rouse Brenda, the deputies repeatedly screamed her name and physically shook her body. One deputy even went so far as to shake Brenda so aggressively that her entire body moved across the bed.
In spite of these repeated, intensive efforts to arouse Brenda, she remained completely unresponsive. Ginder then requested that the deputies summon an ambulance, but the deputies “rebuffed” this request by repeatedly assuring Ginder that it was unnecessary to do so because Brenda was merely sleeping. Moreover, Ginder’s father suggested that Brenda might have lapsed into a diabetic coma, to which one of the deputies replied, “One does not snore if in a diabetic coma.” (Emphasis supplied.) Ginder and her father relied on the deputies’ repeated assurances that Brenda was simply sleeping and their continued affirmation that emergency help was not immediately required. Before they left, the deputies decided that they would leave one of Brenda’s side doors open and unsecured so that Ginder could check on her at a later time. Ginder then relayed this information to Kelly Wallace, who similarly relied on the deputies’ assurances that her mother was merely sleeping and that emergency medical attention was unnecessary.
When Ginder returned to check on Brenda the next morning, she discovered that Brenda had soiled herself and had not moved from the position in which the deputies had left her. Ginder then dialed 911 for the second time in as many days. The dispatcher again attempted to send Sheriffs deputies to the scene, but Ginder pleaded that the dispatcher, instead, send an ambulance. Within less than five minutes an ambulance responded, and Brenda was transported to a local hospital where she died several days later without ever regaining consciousness. It is alleged that this conduct was the direct and proximate cause of the injury which resulted in the decedent’s death.
Consistent with Florida precedent, in this case, we first (A) provide an overview differentiating between a lack of liability *1044 and the presence of sovereign immunity; (B) recognize the duty of the Marion County Sheriffs Office to reasonably conduct a safety check once it has undertaken to respond, has engaged an injured party, and has actually conducted such a check, and then (C) separately and subsequently address the issue of sovereign immunity, which has been waived here because the deputies were conducting an operational-level function that is not immune from tort liability. We make no determination with regard to the ultimate issue of whether the Sheriffs deputies breached the applicable duty of care and were ultimately negligent in carrying out this duty or whether such potential negligence was the legal or proximate cause of the decedent’s death. We further do not address the hypothetical effect of any affirmative defenses in this case. As a result, each of these questions remains for the trier of fact to consider on remand.
II. ANALYSIS
A. Overview
As an initial point of departure, brief clarification is necessary concerning the differences between a lack of liability under established tort law and the presence of sovereign immunity. When addressing the issue of governmental liability under Florida law, we have repeatedly recognized that a duty analysis[13] is conceptually distinct from any later inquiry regarding whether the governmental entity remains sovereignly immune from suit notwithstanding the legislative waiver present in section 768.28, Florida Statutes. See, e.g., Pollock v. Fla. Dep’t of Highway Patrol, 882 So.2d 928, 932-33 (Fla.2004) (“If no duty of care is owed with respect to alleged negligent conduct, then there is no governmental liability, and the question of whether the sovereign should be immune from suit need not be reached. However, if a duty of care is owed, it must then be determined whether sovereign immunity bars an action for an alleged breach of that duty.” (citations omitted)); Henderson v. Bowden, 737 So.2d 532, 534-35 (Fla.1999) (substantially similar); Kaisner v. Kolb, 543 So.2d 732, 733-34 (Fla.1989) (substantially similar). Under traditional principles of tort law, the absence of a duty of care between the defendant and the plaintiff results in a lack of liability, not application of immunity from suit. See, e.g., Clay Elec. Coop., Inc. v. Johnson, 873 So.2d 1182, 1185 (Fla.2003) (identifying “duty of care” as the first required element of a negligence claim). Conversely, sovereign immunity may shield the government from an action in its courts (i.e., a lack of subject-matter jurisdiction)[14] even when the State may otherwise be liable to an injured party for its tortious conduct. Compare Black’s Law Dictionanj 766 (8th *1045 ed.2004) (“sovereign immunity. 1. A government’s immunity from being sued in its own courts without its consent.”), with id. at 545 (“[duty of care]. A legal relationship arising from a standard of care, the violation of which subjects the actor to [tort] liability.”). In other words, the presence of sovereign immunity does not render the State’s actions nontortious (it simply means that the State has not consented to suit in its courts with regard to certain claims). In contrast, the absence of a duty of care renders the defendant nonliable as a matter of law because his, her, or its actions are therefore nontortious vis-a-vis the plaintiff. See, e.g., Kaisner, 543 So.2d at 733-34 (holding that the issue of sovereign immunity does not even arise unless a governmental unit otherwise owes a duty of care to the injured party and would thus be liable in the absence of such immunity); but see Miami-Dade County v. Fente, 949 So.2d 1101, 1103-05 (Fla. 3d DCA 2007) (conflating the issue of whether the government owes the plaintiff a duty of care with the separate, distinct issue of whether the doctrine of sovereign immunity shields the government from tort liability); Seguine v. City of Miami, 627 So.2d 14, 17 (Fla. 3d DCA 1993) (same mistaken reasoning).[15]
As we explained in Kaisner, the public-duty doctrine expressed in Trianon Park Condominium Association v. City of Hialeah, 468 So.2d 912, 919-21 (Fla.1985), and its exceptions, relate exclusively to the question of whether the government owes a duty of care to the individual plaintiff or group of plaintiffs as opposed to the general public. See Kaisner, 543 So.2d at 734 (“Trianon was not intended to, and did not affect our prior pronouncements on the question of governmental immunity. It merely addressed, in that particular factual context, the parallel question of ... duty of care.” (emphasis supplied)). Accordingly, we take this occasion to reaffirm that, in Florida, “[governmental immunity derives entirely from the doctrine of separation of powers, not from [the absence of] a duty of care or from any statutory basis.” Bowden, 737 So.2d at 538 (brackets omitted) (emphasis supplied) (quoting Kaisner, 543 So.2d at 737); see also Commercial Carrier, 371 So.2d at 1017-22 (holding that article II, section 3 of the Florida Constitution (the separation-of-powers provision) requires the judicial application of a discretionary-function exception to the otherwise broad waiver of sovereign immunity present in section 768.28, Florida Statutes).
We review de novo the dismissal of a complaint for failure to state a cause of action. See Fla. Dep’t of Corr. v. Abril, 969 So.2d 201, 204 (Fla.2007) (“[A]ppellate courts review decisions resolving motions to dismiss under a de novo standard where those motions are based on a claim that no legal cause of action exists as alleged in the complaint.” (citing Siegle v. Progressive Consumers Ins. Co., 819 So.2d 732, 734 (Fla.2002))). As explained above, we must address two separate issues in this case: (B) whether the Sheriff of Marion County, acting through two of his deputies, owed the decedent a common-law duty of care because of the manner in which the deputies responded to a 911 call, engaged an individual, and undertook and conducted a safety check;[16] and (C) if so, whether the Sheriff is nonetheless sovereignly immune for his deputies’ allegedly tortious actions. Having undertaken to respond to the 911 call, engaged the decedent, and *1046 completed this safety check and having allegedly placed the decedent in a “zone of risk” by failing to exercise reasonable care, which, as alleged, both increased the risk of harm to decedent and induced third parties — who would have otherwise rendered further aid — to forebear from doing so, we conclude that the Sheriff owed the decedent a common-law duty of care. See Restatement (Second) of Torts §§ 323-324A (1965). We further conclude that the Sheriffs deputies were performing an operational-level function, which involved the implementation of a preexisting policy or program (the established 911 system), and that this operational conduct did not involve the exercise of any type of quasi-legislative discretion. Cf. Wilson v. Miami-Dade County, 370 F.Supp.2d 1250, 1255 (S.D.Fla.2005) (applying Florida law) (“The decision as to how to implement or operate a policy is secondary to the decision to create the policy.... Methods of implementation of policy are at best a secondary concern. Plaintiff, in this case is asking the Court to consider the way in which this policy was implemented and not its fundamental wisdom.” (citations and internal division omitted)). Here, the application of traditional principles of tort law “will not entangle [the judiciary] in fundamental questions of public policy or planning. It merely will require the courts to determine if the officers should have acted in a manner more consistent with the safety of the individual! ] involved.” Kaisner, 543 So.2d at 738.
B. Duty of Care
i. Introduction
Through a duly enacted general law,[17] the Legislature has waived sovereign immunity for the State, its agencies, and its subdivisions in tort actions, rendering the State responsible “in the same manner and to the same extent as a private individual under like circumstances.” § 768.28(5), Fla. Stat. (2004); see also art. X, § 13, Fla. Const. (“Provision may be made by general law for bringing suit against the state as to all liabilities now existing or hereafter originating.”). A threshold matter is whether the Sheriffs deputies owed the decedent a duty of care, because, as alluded to above, there can be no governmental liability unless a common-law or statutory duty of care existed that would have applied to an individual under like circumstances. See, e.g., Pollock, 882 So.2d at 932-33; Bowden, 737 So.2d at 534-35; Kaisner, 543 So.2d at 733-34.
A duty of care is “a minimal threshold legal requirement for opening the courthouse doors.” McCain v. Fla. Power Corp., 593 So.2d 500, 502 (Fla.1992) (footnote and emphasis omitted). This requirement poses a question of law that the court must answer before permitting a negligence claim to proceed before the trier of fact. See Williams v. Davis, 974 So.2d 1052, 1057 n. 2 (Fla.2007) (citing McCain, 593 So.2d at 504); Restatement (Second) of Torts § 328B.[18] A duty of care *1047 requires that the defendant “conform to a certain standard of conduct ... for the protection of others against unreasonable risks.” Clay Elec., 873 So.2d at 1185 (quoting Keeton, supra, § 30, at 164-65). There are generally four recognized bases for imposing a duty of care:
(1) legislative enactments or administration regulations;
(2) judicial interpretations of such enactments or regulations;
(3) other judicial precedent; and
(4) a duty arising from the general facts of the case.
Clay Elec., 873 So.2d at 1185 (formatting altered) (quoting McCain, 593 So.2d at 503 n. 2). Here, we deal with a common-law duty (the undertaker’s doctrine) arising from the general facts of this case. See Restatement (Second) of Torts §§ 323-324A (1965).
ii. The Trianon Taxonomy
Where questions of duty arise in connection with potential governmental liability, we have provided a “rough,” general guide concerning the type of activities that either support or fail to support the recognition of a duty of care between a governmental actor and an alleged tort victim. See Trianon, 468 So.2d at 919 (providing the following list of governmental activities: “(I) legislative, permitting, licensing, and executive officer functions; (II) enforcement of laws and the protection of the public safety; (III) capital improvements and property control operations; and (IV) providing professional, educational, and general services for the health and welfare of ... citizens.”); Yamuni, 529 So.2d at 261 (clarifying that the Trianon taxonomy provides only a “rough guide” as to whether the governmental entity owes the plaintiff a duty of care). Activities listed in category I pertain to the public at large and generally fail to support the recognition of a duty of care owed by a governmental actor to an individual plaintiff.[19] Activities falling within category II are generally owed to the public at large;[20] however, the plaintiff must be given an opportunity to plead facts alleging that the *1048 governmental actor owed the alleged tort victim a “special duty of care ”[21] (i.e., to plead exceptions to the public-duty doctrine). We have outlined the following disjunctive list of exceptions to the Tria-non public-duty doctrine:
A special tort duty ... arise[s] when law enforcement officers become directly involved in circumstances which place people within a “zone of risk ” [1] by creating or permitting dangers to exist, [2] by taking persons into police custody,[22] [3] detaining them, or [4] otherwise subjecting them to danger.[23]
Pollock, 882 So.2d at 935 (emphasis supplied) (citing Kaisner, 543 So.2d at 735; Brown, 837 So.2d at 418). At least two district courts have also articulated a separate “special relationship test,” which appears to have been drawn from contract law and which we need not address in this case. See Pierre v. Jenne, 795 So.2d 1062, *1049 1064 (Fla. 4th DCA 2001); City of Ocala v. Graham, 864 So.2d 473, 477 (Fla. 5th DCA 2004) (relying upon Pierre). In contrast to categories I and II, activities falling within categories III[24] and IV[25] of the Trianon taxonomy may subject the State to “substantial governmental liability” based upon traditional principles of tort law. Trianon, 468 So.2d at 921.

iii. The Sheriff Owed the Decedent a Common-Law Duty of Care

Here, the Sheriffs deputies did not attempt to enforce any law and certainly were not engaged in the protection of the general public; instead, they affirmatively sought to provide a service (a 911 safety check) to a specific individual, Brenda Wallace (the decedent). Cf. Rupp v. Bryant, 417 So.2d 658, 663 (Fla.1982) (“[The] standard for determining [the State’s responsibility for] public servants’ liability is ... predicated on the type of act the official or employee has undertaken when the injury occurs. The focus is not on the label of the public servant’s position.” (emphasis supplied)). This activity does not logically fall within any of the Trianon categories save for category IV, “providing professional, educational, and general services for the health and welfare of ... citizens.” 468 So.2d at 919; cf. Yamuni, 529 So.2d at 260-61. Therefore, the public-duty doctrine associated with category II of Trianon, and any exceptions thereto, are inapposite to the case at bar. We thus consider whether the Sheriff owed the decedent a common-law duty of care pursuant to traditional principles of tort law without having to engage in any inquiry concerning the public-duty doctrine or whether a “special duty” or “special relationship” existed between the Sheriff and the decedent:
Where a defendant’s conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon [the] defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.
[A]s the risk grows greater, so does the duty, because the risk to be perceived defines the duty that must be undertaken.
*1050 ... [T]he trial and appellate courts cannot ñnd a lack of duty if a foreseeable zone of risk more likely than not was created by the defendant.
McCain, 593 So.2d at 503 (citations and emphasis omitted) (quoting Kaisner, 543 So.2d at 735); see also Keeton, supra, § 53, at 359 (“No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists.”).
This Court has long adhered to the common-law doctrine that
[i]n every situation where a man undertakes to act, or to pursue a particular course, he is under an implied legal obligation or duty to act with reasonable care, to the end that the person or property of others may not be injured by any force which he sets in operation, or by any agent for which he is responsible. If he fails to exercise the degree of caution which the law requires in a particular situation, he is held liable for any damage that results to another, just as if he had bound himself by an obligatory promise to exercise the required degree of care.... [Ejven “where a man interferes gratuitously, he is bound to act in a reasonable and prudent manner according to the circumstances and opportunities of the case.’’
Banfield v. Addington, 104 Fla. 661, 140 So. 893, 896 (1932) (citations omitted) (emphasis supplied) (citing 1 Thomas A. Street, Foundations of Legal Liability 92 (1906)) (quoting Flint & Walling Mfg. Co. v. Beckett, 167 Ind. 491, 79 N.E. 503, 506 (1906)). We have continued to apply this doctrine throughout the years. For example, in Union Park Memorial Chapel v. Hutt, 670 So.2d 64 (Fla.1996), we reasoned:
It is clearly established that one who undertakes to act, even when under no obligation to do so, thereby becomes
obligated to act with reasonable care. See Slemp v. City of North Miami, 545 So.2d 256 (Fla.1989) (holding that even if city had no general duty to protect property owners from flooding due to natural causes, once city has undertaken to provide such protection, it assumes the responsibility to do so with reasonable care); Banfield v. Addington, 104 Fla. 661, 667, 140 So. 893, 896 (1932) (holding that one who undertakes to act is under an implied legal duty to act with reasonable care to ensure that the person or property of others will not be injured as a result of the undertaking); Kowkabany v. Home Depot, Inc., 606 So.2d 716, 721 (Fla. 1st DCA 1992) (holding that by undertaking to safely load landscaping timbers into vehicle, defendant owed duty of reasonable care to bicyclist who was struck by timbers protruding from vehicle window); Garrison Retirement Home v. Hancock, 484 So.2d 1257, 1262 (Fla. 4th DCA 1985) (holding that retirement home that assumed and undertook care and supervision of retirement home resident owed duty to third party to exercise reasonable care in supervision of resident’s activities). As this Court recognized over sixty years ago in Ban-field v. Addington, “[i]n every situation where a man undertakes to act, ... he is under an implied legal obligation or duty to act with reasonable care, to the end that the person or property of others may not be injured.” 104 Fla. at 667, 140 So. at 896....
Voluntarily undertaking to do an act that if not accomplished with due care might increase the risk of harm to others or might result in harm to others due to their reliance upon the undertaking confers a duty of reasonable care, because it thereby “creates a foreseeable zone of risk.” McCain v. Florida Power Corp., 593 So.2d 500 (Fla.1992); Kowkabany, 606 So.2d at 720-21....
*1051 Id. at 66-67 (emphasis supplied) (quoting Restatement (Second) of Torts § 324A (1965) in omitted portion); see also Clay Elec., 873 So.2d at 1186 (observing that “the ‘undertaker’s doctrine,’ applies to both governmental and nongovernmental entities” (footnotes omitted)). Hence, the undertaker’s doctrine is a well-developed, entrenched aspect of Florida tort law.
Three sections of the Restatement (Second) of Torts (1965) outline the parameters of this doctrine. First, section 323 provides:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other’s person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other’s reliance upon the underiak-ing.
(Emphasis supplied.)[26] Section 323 “applies whether the harm to the other or his things results from the defendant’s negligent conduct in the manner of his performance of the undertaking, or from his failure to exercise reasonable care to complete it or to protect the other when he discontinues it”; however, “[t]he actor may normally abandon his efforts at any time unless, by giving the aid, he has put the other in a worse position than he was in before the actor attempted to aid him.” § 323 cmts. a, c (emphasis supplied). Consequently,
[wjhere ... the actor’s assistance has put the other in a worse position than he was in before, either because the actual danger of harm to the other has been increased by the partial performance, or because the other, in reliance upon the undertaking, has been induced to forego other opportunities of obtaining assistance, the actor is not free to discontinue his services where a reasonable man ivould not do so. He will then be required to exercise reasonable care to terminate his services in such a manner that there is no unreasonable risk of harm to the other, or to continue them until they can be so terminated.
§ 323 cmt. c (emphasis supplied). Section 324 provides further elucidation of these general principles in situations where the actor “takes charge” of the injured party:
One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by
(a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor’s charge, or
(b) the actor’s discontinuing his aid or prvtection, if by so doing he leaves the other in a ivorse position than when the actor took charge of him.
(Emphasis supplied.) Comment c to this section further explains that
[tjhe bodily harm of which the actor’s conduct is a legal cause may be either a further injury or an increase in the existing injury, due to the improper manner in which the actor is giving the aid or protection, or it may be an aggravation of the original harm which would have been avoided if the actor had exercised reasonable care for the other’s safety.
*1052 (Emphasis supplied.) Finally, section 324A supplies additional insight concerning the type of harm that the tortfeasor’s alleged negligent undertaking must have caused for the courts to recognize a duty of care:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
(a) his failure to exercise reasonable care increases the risk of such harm,
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
(Emphasis supplied.) The disjunctive “increased risk” and “reliance” requirements are both key factors in limiting potential liability. See Clay Elec., 873 So.2d at 1188; see also Restatement (Second) of Torts § 324A, cmts. c, e (1965).
Here, the allegations of the complaint support the conclusion that the Sheriffs deputies affirmatively and specifically undertook to provide aid to Brenda and then provided repeated assurances upon which Brenda’s neighbor and daughter relied, which thereby increased the risk of harm that Brenda faced. First, the deputies responded to the scene, gathered information from Brenda’s neighbor, and then entered Brenda’s home. Once inside, the deputies engaged Brenda by repeatedly shouting her name while aggressively shaking her to the extent that they moved her entire body across her makeshift bed. Despite these auditory and physical stimuli, Brenda remained totally unresponsive. In reply to the suggestion that Brenda was in a diabetic coma and that she was in need of immediate medical attention, the deputies provided “repeated assurances” that Brenda was “merely sleeping” and that it was unnecessary to summon an ambulance. Having undertaken these actions and having provided these assurances, the deputies next left a side door open and unsecured with an unresponsive Brenda left alone inside. As alleged in the complaint, the conduct of these deputies placed Brenda in a readily recognizable zone of risk. These agents of the Sheriff responded to the scene, entered a home, engaged the unconscious resident, provided an assessment of her safety, and, further, assured concerned third parties that she was simply asleep and did not need medical attention. This alleged behavior satisfies the requirements of the undertaker’s doctrine because the deputies, in a position of authority, increased the risk of harm that the decedent faced by inducing third parties — who would have otherwise rendered further aid (and actually requested that the deputies provide additional assistance, but were rebuffed) — to forebear from doing so. See Restatement (Second) of Torts §§ 323-324A; see also Keeton, supra, § 56, at 378 (“If there is no duty to go to the assistance of a person in difficulty or peril, there is at least a duty to avoid any affirmative acts which make his situation worse.... [I]f the defendant does attempt to aid him, and takes charge and control of the situation, he is regarded as entering voluntarily into a relation which is attended with responsibility.”).
Accordingly, we hold that the complaint states a negligence-based wrongful-death cause of action against the Sheriff of Marion County. See § 768.19, Fla. Stat. (2004) (“When the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person, ... and the event would have entitled the person injured to maintain an *1053 action and recover damages if death had not ensued, the person ... that would have been liable in damages if death had not ensued shall be liable for damages as specified in this act notwithstanding the death of the person injured ....” (emphasis supplied)).
C. Sovereign Immunity Does Not Bar the Plaintiff-Petitioner’s Claim
Under Florida law, we have held that the plaintiff-petitioner’s second amended complaint states a valid cause of action against the Sheriff in his official capacity. Therefore, we now turn to the question of whether sovereign immunity bars this action against the Sheriff despite the alleged negligence of his deputies. See, e.g., Pollock, 882 So.2d at 933 (“[I]f a duty of care is owed, it must then be determined whether sovereign immunity bars an action for an alleged breach of that duty.”); Bowden, 737 So.2d at 535 (substantially similar); Kaisner, 543 So.2d at 733-34, 736 (substantially similar). In Commercial Carrier, this Court enunciated the abiding test for determining whether a governmental entity enjoys sovereign immunity notwithstanding the otherwise broad waiver present in section 768.28, Florida Statutes. Despite the absence of an express discretionary-function exception within the statute itself, we held that the separation-of-powers provision present in article II, section 3 of the Florida Constitution requires that “certain [quasi-legislative] policy-making, planning or judgmental governmental functions cannot be the subject of traditional tort liability.” 371 So.2d at 1020. Because every human endeavor involves some level of discretion in the dictionary sense, this Court was quick to reject such an approach. See, e.g., Yamuni, 529 So.2d at 260 (“[We have rejected] the definitional approach to ‘discretion’ ... because ‘all governmental functions, no matter how seemingly ministerial, can be characterized as embracing the exercise of some discretion in the manner of their performance.’ [Commercial Carrier,] 371 So.2d at 1021. We have no doubt that the [governmental agents] exercised discretion in the dictionary or English sense of the word, but discretion in the Commercial Carrier sense refers to discretion at the policy making or planning level.” (emphasis supplied)). “Planning level functions are generally interpreted to be those requiring basic policy decisions, while operational level functions are those that implement policy.” Commercial Carrier, 371 So.2d at 1021 (emphasis supplied). This distinction “requires us to find and isolate those areas of quasi-legislative policy-making which are sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the governmental decision.” Id. at 1021 (emphasis supplied) (quoting Johnson v. State, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352, 360-61 (1968)). Functionally, the discretionary-versus-operational-function test is intended “to determine where, in the area of governmental processes, orthodox tort liability stops and the act of governing begins.” Commercial Carrier, 371 So.2d at 1018.
To aid us in addressing this issue, we have adopted a group of four related questions. See Commercial Carrier, 371 So.2d at 1019 (adopting the four-part test outlined in Evangelical United Brethren Church v. State, 67 Wash.2d 246, 407 P.2d 440, 445 (1965)). If each of these questions may be “clearly and unequivocally” answered in the affirmative, then “the challenged act, omission, or decision” is likely discretionary in nature and immune from a tort action; whereas, if any one of the questions may be answered in the negative, further inquiry is necessary to determine whether, under the circumstances, the question of tort liability will or will not entangle the Court in a nonjusticiable political question that is more appropriately *1054 committed to the resolution of a coordinate or constituent branch of government (e.g., the Legislature, the executive branch, or a county or municipality). Commercial Carrier, 371 So.2d at 1019; cf. also Johnson v. State, 660 So.2d 687, 646 (Fla.1995) (“[Political questions — as opposed to legal questions — fall within the exclusive domain of the legislative and executive branches under the guidelines established by the Florida Constitution. Art. II, § 3, Fla. Const.”); Black’s Law Dictionary 1197 (8th ed.2004) (“political question. A question that a court will not consider because it involves the exercise of discretionary power by the executive or legislative branch of government.”).
We now apply the four-part test adopted in Commercial Carrier to the situation presented in this case. First, does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? Yes, in a general sense, this case (at least indirectly) involves the Sheriff or county’s basic policy decision to establish a 911 call-response system. Second, is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? The challenged actions here are not essential to the realization of this policy or program; safer methods or means of responding to safety checks “may exist that would both protect [injured parties] and meet the government’s objectives.” Further, the actions of the deputies were “not necessary to or inherent in policy or planning,” and merely reflected a secondary decision as to how preexisting policies, plans, programs, or objectives would be implemented. Kaisner, 543 So.2d at 737. Third, does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? No, this legal action merely asks the Court to consider the operational manner in which a safety check was conducted and implemented, not the fundamental wisdom of creating such a policy or program as an initial matter. Cf. id. Finally, does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision? Yes, by all accounts, the Sheriff has the unquestioned authority to respond .to 911 calls within his jurisdiction. Cf. § 30.15, Fla.Stat. (2004) (outlining the basic powers, duties, and obligations of Florida’s sheriffs).[27]
Based upon our review of these questions, we hold that the alleged actions of the deputies’ were undertaken within the scope of them employment and were clearly operational in nature. Subjecting the Sheriff to responsibility and accountability in this case does not involve judicial scrutiny of any discretionary, quasi-legislative policy-making or planning; instead, such a legal inquiry will merely require the trier of fact to determine — consistent with traditional principles of Florida tort law— whether the deputies should have acted in a manner more consistent with the safety of the decedent. See Kaisner, 543 So.2d at 737-38. The traditional principles of tort law implicated in this case in no way present a nonjusticiable political question.
*1055 III. CONCLUSION
For the reasons provided in our analysis, we quash the decision of the Fifth District Court of Appeal in Wallace v. Dean, 970 So.2d 864 (Fla. 5th DCA 2007), approve and reaffirm the decisions listed in footnote 2, supra, to the extent that they are consistent with our analysis and holding, and conclude that the Sheriff undertook and owed the decedent a common-law duty of care. We further conclude that the actions of his deputies were operational in nature. Consequently, the plaintiff-petitioner’s second amended complaint stated a valid negligence-based wrongful-death cause of action, which is not barred by the doctrine of sovereign immunity. We remand for further proceedings consistent with this opinion.
It is so ordered.
QUINCE, C.J., PARIENTE, J., and ANSTEAD, Senior Justice, concur.
WELLS, J., dissents with an opinion, in which CANADY, J., concurs.
POLSTON, J., dissents with an opinion.

. See, e.g., Wallace, 970 So.2d at 866 ("According to Ms. Wallace, the duty arose because (1) once the deputies undertook to check on the well-being of the decedent, they had a duty to do so with reasonable care; (2) the deputies' negligent actions increased the risk of harm to the decedent; and (3) the decedent's neighbor relied on the deputies' actions and statements and, as a consequence, failed to call an ambulance.” (emphasis supplied)).

. See, e.g., Breaux v. City of Miami Beach, 899 So.2d 1059, 1061 (Fla.2005) (having undertaken to operate a public beach as a swimming area, the city had a duty to do so in a reasonable manner); Slemp v. City of N. Miami, 545 So.2d 256, 258 (Fla.1989) ("Once the city has undertaken to provide [flood] protection, by building a storm sewer pump system, ... it assumes the responsibility to do so with reasonable care.” (emphasis supplied)); Dep't of Health & Rehab. Servs. v. Yamuni, 529 So.2d 258, 262 n. 3 (Fla.1988) ("[T]he volun-taiy assumption of responsibilities which might be undertaken by others creates a duty of care on the part of the assuming party.” (emphasis supplied)) (decision involved state supervision and care of children); Avallone v. Bd. of County Comm’rs, 493 So.2d 1002, 1005 (Fla.1986) (having undertaken to operate a swimming facility, the government has a duty to do so in a reasonable manner); Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010, 1017 (Fla.1979) ("[I]t is horn-book tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner.” (emphasis supplied) (quoting Indian Towing Co. v. United States, 350 U.S. 61, 64-65, 76 S.Ct. 122, 100 L.Ed. 48 (1955)) (decision involved governmental entity maintaining existing intersection and traffic-control devices)); Hinckley v. Palm Beach County Bd. of Comm’rs, 801 So.2d 193, *1039 195-96 (Fla. 4th DCA 2001) (county owed the plaintiffs developmentally disabled daughter a duty of care to provide safe transportation once it undertook to supply her with such services); Grace v. City of Miami, 661 So.2d 1232, 1233 (Fla. 3d DCA 1995) (“Once the City undertakes to provide a lunch program for children at a city-owned park, it assumes the duty to operate the program safely.” (emphasis supplied)); White v. City of Waldo, 659 So.2d 707, 710 (Fla. 1st DCA 1995) (police officer undertaking to capture loose horse on highway creates a duty of care to surrounding civilian motorists (citing Restatement (Second) of Torts section 323 (1965))); Hartley v. Floyd, 512 So.2d 1022, 1024 (Fla. 1st DCA 1987) (having undertaken the duty to check a boat ramp for the presence of decedent's truck and trailer, a sheriff's deputy had a duty to do so in a reasonable manner); Dep’t of Highway Safety & Motor Vehicles v. Kropff, 491 So.2d 1252, 1255-56 (Fla. 3d DCA 1986) (state trooper undertaking to secure the scene of an automobile collision had a duty to do so with reasonable care); Padgett v. Sch. Bd. of Escambia County, 395 So.2d 584, 585 (Fla. 1st DCA 1981) (having undertaken the operation of school-crossing lights, the school board had a duty to do so in a reasonable manner).

. See Crossley v. State, 596 So.2d 447, 449 (Fla.1992); Combs v. State, 436 So.2d 93, 94 (Fla.1983).

. To wit: (1) the announcement of a rule of law that conflicts with a rule previously announced by this Court or another district court; or (2) the application of a rule of law to produce a different result in a case that involves substantially similar controlling facts as a prior case disposed of by this Court or another district court. See Nielsen, 117 So.2d at 734.

. As a necessary precondition to discounting the guiding principle of stare decisis, we have traditionally asked the following questions, each of which merits a negative response in this context: (1) whether the prior precedent has proven unworkable due to its reliance upon an erroneous legal fiction; (2) whether the rule of law could be reversed without serious disruption in legal doctrine and injustice to those relying upon the law; and (3) whether the underlying premise of the prior precedent has changed so dramatically that it lacks legal justification. See, e.g., N. Fla. Women's Health & Counseling Servs., Inc. v. State, 866 So.2d 612, 637 (Fla.2003).

. See, e.g., Engle v. Liggett Group, Inc., 945 So.2d 1246, 1254 (Fla.2006) (identifying misapplication of our precedent as one means of supplying conflict jurisdiction); Aguilera v. Inservs., Inc., 905 So.2d 84, 86 (Fla.2005) (same); Knowles v. State, 848 So.2d 1055, 1056 (Fla.2003) (same); Robertson v. State, 829 So.2d 901, 904 (Fla.2002) (same); Vest v. Travelers Ins. Co., 753 So.2d 1270, 1272 (Fla.2000) (same); State v. Stacey, 482 So.2d 1350, 1350 (Fla.1985) (same); Arab Termite & Pest Control of Fla., Inc., 409 So.2d 1039, 1040 (Fla.1982) (same).

. Kaisner v. Kolb, 543 So.2d 732, 735-36 (Fla.1989) ("Where a defendant’s conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon [the] defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.... We see no reason why the same analysis should not obtain in a case in which the zone of risk is created by the police.” (citations and internal division omitted)).

.We also approve and reaffirm the decisions listed in footnote 2, supra, to the extent that they are consistent with our analysis and holding.

. Such abstract notions of sound public policy are not proper judicial considerations when conducting the above-described duty and sovereign-immunity analyses. Through their elected officials, the voters of this state have already made the policy decisions to waive sovereign immunity subject to certain limitations, see section 768.28, Florida Statutes (2004), to permit the operation of 911 systems, to support the governmental provision of safety checks, and to permit governmental entities to engage in many other activities vis-á-vis civilians. After a governmental policy or program has been adopted, it cannot be carried out with operational impunity and in a manner with total disregard to the injuries that it may inflict upon Floridians. Moreover, the Legislature has always been cognizant of the need to avoid crushing tort liability for governmental entities. For that reason, it has seen fit to (1) cap the recoverable damages in the absence of a special claims bill ($100,000 per claimant, $200,000 per incident or occurrence), see section 768.28(5), Florida Statutes (2004); and (2) preserve the ability for governmental entities to purchase insurance, participate in risk-management programs, and to self-insure, see sections 30.555, 768.28(13), (16)(a), Florida Statutes (2004). Cf. Cir. Ct. of Twelfth Jud. Cir. v. Dep’t of Nat. Resources, 339 So.2d 1113, 1116 (Fla.1976) (observing that section 768.28, Florida Statutes, permits Florida governmental entities to purchase insurance: "Consequently, a source of payment of claims other than the treasury of the state is provided incident to the waiver, a fact which obviates the primary concern expressed in the decisions applying the sovereign immunity doctrine." (emphasis supplied)). The courts have no authority to usurp this decision-making process based upon speculative, countervailing judicial notions of appropriate public policy. Unlike the primary dissent, we will not disregard these aspects of Florida law.

. See Henderson v. Bowden, 737 So.2d 532, 537 (Fla.1999) ("Everton ... dealt with the narrow, albeit important, issue of whether the decision to make an arrest by a law enforcement officer pursuant to the State's police power is a discretionary level function protected by sovereign immunity.”). The primary dissent materially misconstrues and mischaracterizes the issue and holding presented in Everton. Specifically, Everton did not involve any question with regard to a law-enforcement officer's "decision not to assist.” Dissenting op. at 1057 (Wells, J., joined by Canady, J.). Rather, as is manifestly clear from Everton and our later precedent, that decision involved a police officer's decision not to arrest a drunk driver, who, within minutes, struck and killed a plaintiff's decedent and severely injured the other plaintiff. See 468 So.2d at 937. Therein, we addressed the narrow issue of whether a law-enforcement officer's initial decision to arrest or not arrest an individual or to enforce or not enforce a particular criminal law is a discretionary function that is, correspondingly, immune from tort liability. See id. Under those circumstances, we held that such decisions are indeed discretionary. See id. That being said, Everton in no way, shape, form, or fashion addressed a "decision not to assist” an obviously injured, helpless person after law-enforcement officers had affirmatively responded to the scene and engaged the individual.

. In contrast to the primary dissent, we do not hold the Sheriff and his deputies to the standard of care required of medical personnel. Assuming that the plaintiff-petitioner is ultimately able to establish the facts as pled in her complaint, the trial court should instruct the fact finder to hold the Sheriff and his deputies to the standard of care required of reasonable law-enforcement officers under like circumstances. On remand, it remains for the parties to contend precisely what this standard required of the deputies vis-á-vis the decedent. Therefore, the question of whether the deputies breached this standard of care is properly a question for the finder of fact, not our dissenting colleagues. See, e.g., Williams v. Davis, 974 So.2d 1052, 1057 n. 2 (Fla.2007).

. In contending that Ms. Ginder should be subject to tort liability for her assistance in this case, the primary dissent ignores that the second amended complaint alleges that the plaintiff-petitioner requested that Ms. Ginder check on the decedent and then dial 911 if necessary. Ms. Ginder did so, and, as alleged in the complaint, she then relied upon the affirmative actions and assertions of the responding deputies (as did the plaintiff-petitioner).

. Which, when relevant, may include examination of the so-called public-duty doctrine and its recognized exceptions. See part II. B.ii., infra.

. For example, the First District Court of Appeal has observed:
Prior to the effective date of [section] 768.28(6)[, Florida Statutes,] courts did not have subject matter jurisdiction of tort suits against the State and its agencies because they enjoyed sovereign immunity pursuant to Article X, [s]ection 13, Florida Constitution. However, by enacting [section] 768.28 the [LJegislature provided for waiver of sovereign immunity in tort actions. Therefore, pursuant to that statute, courts ... now have subject matter jurisdiction to consider suits which fall within the parameters of the statute.
Hutchins v. Mills, 363 So.2d 818, 821 (Fla. 1st DCA 1978) (citations omitted), cert. denied, 368 So.2d 1368 (Fla.1979) (table); see also Kropff, 491 So.2d at 1254 n. 1 ("Sovereign immunity relates to subject matter jurisdiction. Parties may not confer subject matter jurisdiction by waiver, failure to object, or consent where none is given by law. Governmental immunity may be raised at any time." (citations omitted)).

. Reasoning aside, we express no opinion as to the underlying propriety of the results reached by the Third District Court of Appeal in these decisions.

. The plaintiff-petitioner has not relied upon any alleged statutory duty of care.

. See ch. 73-313, Laws of Fla.

. The remaining elements of a negligence claim, which we need not consider in this case, include: (2) breach; (3) legal or proximate causation; and (4) actual damages. See Clay Elec., 873 So.2d at 1185; see also Restatement (Second) of Torts § 328A. In the majority of negligence actions, each of these elements is properly a question for the trier of fact. See, e.g., Williams, 974 So.2d at 1057 n. 2 ("The determination of whether [a] duty was breached in a particular instance ... will ordinarily be reserved for the fact-finder."); McCain, 593 So.2d at 504 ("[T]he question of foreseeability as it relates to proximate causation generally must be left to the fact-finder to resolve. Thus, where reasonable persons could differ as to whether the facts establish proximate causation ... then the resolution of the issue must be left to the fact-finder.... The judge is free to take this matter from the fact-finder only where the facts are unequivocal, such as where the evidence supports no *1047 more than a single reasonable inference.” (citations omitted)); Slemp, 545 So.2d at 258 ("The question of the proximate cause of the damage is one of fact, and should have been submitted to a jury.”); see also Restatement (Second) of Torts § 328C.

. See Trianon, 468 So.2d at 919 ("Clearly, the [Ljegislature, commissions, boards, city councils, and executive officers, by their enactment of, or failure to enact, laws or regulations, or by their issuance of, or refusal to issue, licenses, permits, variances, or directives, are acting pursuant to basic governmental functions performed by the legislative or executive branches of government. The judicial branch has no authority to interfere with the conduct of those functions unless they violate a constitutional or statutory provision. There has never been a common law duty establishing a duty of care with regard to how these various governmental bodies or officials should carry out these functions. These actions are inherent in the act of governing.").

. See Trianon, 468 So.2d at 919 (“How [i.e., the selection of the means by which] a governmental entity, through its officials and employees, exercises its discretionary power to enforce compliance with the laws duly enacted by a governmental body is a matter of governance, for which there never has been a common law duty of care.”); see also Dep’t of Corr. v. Vann, 650 So.2d 658, 660-62 (Fla. 1st DCA), approved, 662 So.2d 339 (Fla.1995) (law-enforcement officers owe a general duty to the public at large to capture escaped prisoners who are not currently within their general control); Carter v. City of Stuart, 468 So.2d 955, 957 (Fla.1985) (addressing the means of enforcing a municipal dog-bite ordinance); City of Daytona Beach v. Palmer, 469 So.2d 121, 122 (Fla.1985) ("[T]here has never been a common law duty of care to individual property owners to provide fire protection services.”); Wong v. City of Miami, 237 So.2d 132, 134 (Fla.1970) (the allocation of police manpower during a riot involves a public duty (i.e., protection of public safety), which is also discretionary in nature).

. See, e.g., Everton, 468 So.2d at 938 ("We recognize that, if a special relationship exists between an individual and a governmental entity, there could be a duty of care owed to the individual.”).

. In this case, the Sheriff has relied heavily upon the fact that he did not take Brenda Wallace into custody. However, as we clarified years ago, custody is but one means through which the police may create a special duty of care with regard to an individual. Cf. Bowden, 737 So.2d at 536 ("[O]ur holding today is not based on the fact that the passengers may or may not have been in the deputies' custody. Rather, our decision is based on the fact that the deputies’ actions placed the passengers in danger." (emphasis supplied)); see also Brown v. Miami-Dade County, 837 So.2d 414, 417 (Fla. 3d DCA 2001) ("[A] police officer's duty to exercise reasonable care is not limited to 'hot pursuit’ situations or cases involving a custodial relationship between the police officer and the injured party.”). Further, this case does not involve the Trianon public-duty doctrine or any of its exceptions, because the response of a sheriff’s deputy or a police officer to a request for a safety check does not involve enforcement of the criminal law (e.g., the decision of whether to arrest a suspect or whether to enforce a particular law in a given situation) or the protection of public safety (e.g., riot control, fire protection, or locating and capturing escaped prisoners); rather, it constitutes a category IV governmental activity to which the public-duty doctrine does not apply.

. For examples of law-enforcement activities creating a zone of risk that affects a determinate individual or group see the following cases: Henderson v. Bowden, 737 So.2d 532, 537 (Fla.1999) (having stopped and arrested the intoxicated driver of a vehicle, the police had a duty to reasonably safeguard the well-being of the passengers); City of Pinellas Park v. Brown, 604 So.2d 1222, 1226 (Fla.1992) (officers conducting a high-speed chase of a man who ran a red light had a duty to reasonably safeguard surrounding motorists); Kaisner v. Kolb, 543 So.2d 732, 734 (Fla.1989) (officers detaining a man and his family pursuant to a traffic stop had a duty to reasonably safeguard their well-being); Lewis v. City of St. Petersburg, 260 F.3d 1260, 1263-64 (11th Cir.2001) (applying Florida law) (police officers had a duty to reasonably handle their firearms during the conduct of a traffic stop); Moore v. Fla. Fish & Wildlife Conservation Comm'n, 861 So.2d 1251, 1253 (Fla. 1st DCA 2003) (while detaining fisherman, a Fish and Wildlife Conservation officer had a duty to reasonably safeguard his well-being); Brown v. Miami-Dade County, 837 So.2d 414, 417-18 (Fla. 3d DCA 2001) (when conducting a sting operation in a hotel, the police had a duty to reasonably protect the safety of innocent bystanders); City of Miami v. Hong-De La Cruz, 784 So.2d 475, 478 (Fla. 3d DCA 2001) (when giving chase to a criminal suspect in the midst of a crowded street festival, a police officer had a duty to reasonably safeguard surrounding revelers); Sams v. Oelrich, 717 So.2d 1044, 1047 (Fla. 1st DCA 1998) (having taken an escaped convict to a hospital emergency room for medical attention, a sheriff's deputy had a duty to reasonably control the convict who was then in his custody for the benefit of other persons populating the ER); Weissberg v. City of Miami Beach, 383 So.2d 1158, 1158-59 (Fla. 3d DCA 1980) (having undertaken to direct traffic, police officer owed motorist a duty to do so with reasonable care).

. See Trianon, 468 So.2d at 920-21 (‘‘[T]here is no liability for the failure of a governmental entity to build, expand, or modernize capital improvements such as buildings and roads.... On the other hand, once a governmental entity builds or takes control of property or an improvement, it has the same common law duty as a private person to properly maintain and operate the property.” (citations omitted)); see also Fla. Dep’t of Nat. Resources v. Garcia, 753 So.2d 72, 75 (Fla.2000) (a governmental entity operating a public swimming area owes the same operational-level duty to invitees as a private landowner— to maintain the premises in a reasonably safe condition and to warn the public of any dangerous conditions of which it knew or should have known); Slemp, 545 So.2d at 258 (duty to maintain and properly operate existing flood-protection device); City of Jacksonville v. Mills, 544 So.2d 190, 192 (Fla.1989) (maintenance of courthouse); Palm Beach County Bd. of Comm'rs v. Salas, 511 So.2d 544, 545 (Fla.1987) (maintenance of intersection); Avallone, 493 So.2d at 1005 (operation of swimming pool); Ralph v. City of Daytona Beach, 471 So.2d 1, 1-4 (Fla.1983) (traffic control on beach); City of St. Petersburg v. Collom, 419 So.2d 1082, 1083 (Fla.1982) (duty to warn of known, hidden dangers); Dep’t of Transp. v. Neilson, 419 So.2d 1071, 1073, 1077-78 (Fla.1982) (no duty to alter or upgrade existing intersection, but duty to maintain intersection and to warn of known, hidden dangers).

. See Trianon, 468 So.2d at 921 ("Providing professional, educational, and general services for the health and welfare of citizens is distinguishable from the discretionary power to enforce compliance with laws passed under the police power of this state. These service activities, such as medical and educational services, are performed by private persons as well as governmental entities, and common law duties of care clearly exist.”).

. Without resort to precedent or persuasive legal authorities, the primary dissent disregards or discounts the disjunctive nature of the undertaker's doctrine, which requires an increased risk of harm or reliance resulting in harm. Further, as we explain, each disjunctive prong is satisfied in this case.

. See Yamuni, 529 So.2d at 260 n. 1 ("Question number four has limited value under Florida's statutory waiver of immunity because the answer will almost invariably be yes unless the government employees, officers, or agents are acting without authority outside the scope of their office or employment. If this is so, they would be personally liable under [section] 768.28 and the state would be immune because the waiver of immunity would not be applicable.”).