MAKAR, J.,
specially concurring.
At about 2:14 a.m. on a Sunday morning in February 2009, Tiffanye Cobb, a 37-year-old “emotionally disturbed woman who had previously been involuntarily committed to a mental health facility,” called the police for assistance at her apartment. She told the dispatcher that “she had purchased a firearm and needed help un-jamming it.” When a deputy arrived, she told her the same story, saying she “had recently purchased a gun from an unknown male she had never spoken to before.” She “was not really familiar with the firearm and was messing with it and cocked it and could not un-coek it,” so she took “the weapon outside her apartment and discharged one round into her laundry basket.” She showed the deputy “where the bullet entered the laundry basket.”
Cobb told the deputy that “she was paranoid that if any crime happened in the area someone might think it was her.” She told the deputy the “empty shell casing from the round she discharged into the laundry basket” was “stuck in the gun and she could not get it out and asked [the deputy] to help her.” The gun contained all live rounds “except for one empty shell casing of the round Cobb said she shot into her laundry basket.” The deputy, after determining the gun wasn’t stolen, “unjammed the firearm,” left it “on the kitchen table,” and departed. Soon thereafter, *53 “Cobb pressed the revolver to her head and pulled the trigger. The bullet entered her right temple and the wound was fatal.”
Cobb had an extensive history of mental illness including having been involuntarily institutionalized over the past decade, which the Sheriffs office knew. Cobb also “made bizarre and inappropriate calls to [the Sheriffs office] on almost a monthly basis” and she “made complaints or was the subject of complaints or calls to Defendant about 23 times in two years,” “repeatedly referring] to her mental health condition or ma[king] reference to her pri- or Baker Acts.”
These three paragraphs are the allegations of her estate’s wrongful death claim against the Sheriff,[1] which the trial court dismissed with prejudice (after prior dismissals without prejudice). As emphasized, these are the estate’s untested version of the events leading to Cobb’s death. The estate claims a duty was owed to Cobb under these circumstances, which was breached, creating a risk to Cobb, the proximate and foreseeable result of which was that Cobb, being mentally ill and having discharged a firearm in the early morning hours, was put in “imminent danger to herself.” The estate alleges “that in assisting Ms. Cobb, it endangered her.”
Our panel has agreed to affirm the dismissal in this case, with which I agree, but not without pause, due in large measure to the posture of the case before us. At the motion to dismiss stage, the estate’s allegations are presumed true, the legal question being whether a duty existed that the deputy negligently breached and, if so, are those actions shielded from liability under principles of sovereign immunity? The Sheriff says no duty exists and immunity applies, specifically pointing to Everton v. Willard, 468 So.2d 936 (Fla.1985), which held that the decision whether to arrest an individual is a discretionary one that is immune from tort liability. The deputy in this case, if the facts alleged are true, could have arrested Cobb for the improper discharge of the weapon (Cobb shot it in an apartment complex thereby endangering herself and others) or held the weapon as evidence, thereby preventing its further use by Cobb. The estate, however, disclaims that its case is based on a “failure to arrest” theory, pointing instead to Wallace v. Dean, 3 So.3d 1035, 1042 (Fla.2009).
In Wallace, police deputies responded to a 911 call, finding a woman unconscious and completely unresponsive. Rather than summon assistance, they assured concerned neighbors that the woman was in no need of medical attention and they departed. The next morning, the neighbors found the woman, her clothing soiled, in the same position. Another 911 call was made, an ambulance was sent at the neighbors urging, and the woman was taken to a hospital where “she died several days later without ever regaining consciousness.” Id. at 1043. In deciding whether a tort claim existed, the supreme court undertook the familiar two step analysis in governmental tort case: (1) did a legal duty exist that was breached; and (2) if so, whether the sheriff was “nonetheless immune for his deputies’ allegedly tortious actions.” Id. at 1045.
The supreme court held that the facts alleged established a common law legal duty on the sheriff, acting through his *54 deputies, to conduct the safety check in a non-negligent manner.
Having undertaken to respond to the 911 call, engaged the decedent, and completed this safety check and having allegedly placed the decedent in a “zone of risk” by failing to exercise reasonable care, which, as alleged, both increased the risk of harm to decedent and induced third parties-who would have otherwise rendered further aid-to forebear from doing so, we conclude that the Sheriff owed the decedent a common-law duty of care.
Id. 1045-46. In reaching this conclusion, our supreme court decided that the safety check fell within the fourth category (IV) of the so-called “Trianon Taxonomy” established in Trianon Park Condominium, Association, Inc. v. City of Hialeah, 468 So.2d 912 (Fla.1985), stating “the Sheriffs deputies did not attempt to enforce any ■ law and certainly were not engaged in the protection of the general public; instead, they affirmatively sought to provide a service (a 911 safety check) to a specific individual, Brenda Wallace (the decedent).” Id. at 1049. In essence, the safety check was deemed akin to other “professional and general services” for which a governmental tort duty applied. Trianon, 468 So.2d at 921. Having undertaken the task, it had to be performed in a non-negligent way.
The estate argues that the sheriff had no general duty to assist Cobb or protect the public, but having chosen to assist her in unjamming her gun and making it operable (the so-called “undertaker’s doctrine”), it had to perform that undertaking in a non-negligent way and without creating additional risks or dangers to her; that Cobb had just discharged the weapon and had a history of mental illness, of which the estate’s complaint says the sheriff knew, reinforces the estate’s conclusion that a duty existed. The sheriff argues that the deputy only had a general duty to the public at large; absent a special relationship, no duty existed. Cobb had “simply requested the presence of a deputy sheriff to assist her in the operation of a recently purchased firearm” that was “purchased for purposes of self-protection.” Distinguishing Wallace, the sheriff says Cobb’s call was not an emergency “involving an individual who was in obvious medical distress and in need of medical attention.” The deputy had no reason to believe Cobb presented a suicide risk, making the deputy’s actions purely discretionary.
Cobb’s call for assistance with her firearm is not unlike the “safety check” performed in Wallace, which the supreme court deemed the provision of a service that, if undertaken, must be performed non-negligently. A call to the police to provide a generic service, say for example to check a leaky natural gas line that a police officer gratuitously but negligently repairs, would seem to establish a duty under Wallace. Unjamming a gun is a service, one that non-governmental actors have to perform non-negligently. If Cobb had called a gunsmith who unjammed the gun, knowing that Cobb was mentally unstable and had just bought and discharged it in a laundry basket in the wee hours of the morning, a duty might exist. Unlike the situation in Wallace, Cobb did not call 911, but a duty can arise whether or not a call for service is urgent; that Cobb’s call was not an urgent one would seem to make the estate’s “service” claim stronger, rather than weaker.
Even if a duty exists, is sovereign immunity a bar? On this point, the estate provides little guidance, arguing generally that the estate’s claims are “analogous to those recognized as outside sovereign immunity.” It doesn’t discuss or develop any *55 specific basis for why the deputy’s actions are without immunity. The sheriffs brief, repeating verbatim his trial memorandum, assumes that the estate’s argument is that Cobb should have been arrested, which provides no basis for liability under Willard, discussed above; he also points to eases where immunity protected discretionary decisions whether to take intoxicated or mentally unstable persons into custody. He concludes that the deputy’s actions, or failure to act, amount to purely discretionary ones to which immunity applies.
In Wallace, the supreme court concluded, based on its detailed analysis of the four factors derived from Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010, 1014-15 (Fla.1979),[2] that “the Sheriffs deputies were performing an- operational-level function, which involved the implementation of a preexisting policy or program (the 911 system), and that this operational conduct did not involve the exercise of any type of quasi-legislative discretion.” Wallace, 3 So.3d at 1046. In contrast, no analysis of these four factors is presented on appeal, leaving our court with little guidance from either party on the complex issue of sovereign immunity. On this record, where the immunity question has been presented in a way that limits our ability to address it meaningfully, we must defer to the trial court and affirm its conclusions. See Applegate v. Barnett Bank of Tallahassee, 377 So.2d 1150, 1152 (Fla.1979) (“In appellate proceedings the decision of a trial court has the presumption of correctness and the burden is on the appellant to demonstrate error.”); Philip J. Padovano, Fla. Appellate Practice § 19:2 (2015) (“The party seeking review of the decision has the burden of overcoming this presumption by demonstrating that the lower tribunal committed reversible error. In the absence of such a showing, the presumption of correctness will require the appellate court to affirm the decision.”).
Based upon the allegations in the second amended complaint, it appears that a duty exists in this case based upon the rationale expressed in Wallace. But because the presumption of correctness of the trial court’s order as to the immunity issue has not been rebutted, I agree that affirmance is proper.

. See Keck v. Eminisor, 104 So.3d 359, 366 (Fla.2012) (“If a State officer, employee, or agent acts within the scope of employment and does not act in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard, the plaintiff’s exclusive recourse is to seek damages from the governmental entity or the head of such entity in his or her official capacity.”).

. Those four non-exclusive factors, as described in Commercial Carrier, are as follows:
(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision? If these preliminary questions can be clearly and unequivocally answered in the affirmative, then the challenged act, omission, or decision can, with a reasonable degree of assurance, be classified as a discretionary governmental process and nontortious, regardless of its unwisdom. If, however, one or more of the questions call for or suggest a negative answer, then further inquiry may well become necessary, depending upon the facts and circumstances involved.
371 So.2d at 1019.