SALTER, J.
 

 In this appeal and cross-appeal we review a parochial high school’s alleged liability for the tragic results of a 17-year-old student’s consumption of alcohol at, and operation of an automobile after, an end-of-school-year party at a private residence. Despite three novel circumstances presented by the trial record, we conclude again that:
 

 At some point, we believe that a school’s obligation of reasonable supervision must come to an end and the parent or guardian’s duty of supervision must resume. That logical point, we think, should be when the student leaves the school’s premises during non-school hours and is no longer involved in school-related activities.
 
 [1]
 

 Based on this well-settled principle and other points detailed in this opinion, we reverse the verdict and amended final judgment below, and we direct the entry of a judgment in favor of the appellants. We review the factual record in the light most favorable to the appellees, and then consider in turn these legal issues:
 

 1. Was the after-school event school sponsored or school related?
 

 2. Did the principal’s visit to the front of the private residence during the party, or the school’s handbook regarding such parties, create a duty on the part of the school pursuant to the undertaker’s doctrine?
 

 3. Did the trial court correctly interpret section 768.36, Florida Statutes (2001), “alcohol or drug defense,” as applied to the facts of this case?
 

 4. Did the trial court abuse its discretion in sustaining an objection to the admissibility of records regarding the injured student’s (the driver’s) prior treatment for alcohol dependence, including an admission that a few months before the accident the eleventh-grade student had consumed 24 beers in 24 hours?
 

 Our analysis and conclusions on these issues render moot a fifth argument by the school regarding the appellees’ counsel’s alleged misconduct during the course of the trial. A sixth issue raised by the school, the entitlement of the appellees to attorney’s fees and costs (whether as prevailing parties or “under the doctrine of ‘equitable conduct’ as an appropriate sanction”), is not ripe for our review on this record. The trial court reserved jurisdiction to make a limited award of attorney’s fees and costs incurred by the appellees’ counsel as a consequence of the school’s delay in producing certain original documents and notes.
 
 [2]
 
 At such time, if any, as
 
 *536
 
 the appellees move for and obtain a judgment in the ti'ial court fixing the amount of such an award and establishing how any fees awarded are attributable to the alleged delay in production of the documents, that issue will become ripe for appeal.
 

 In the cross-appeal, Gabriel Maynoldi (the tragically-injured high school student) and his parents assert as error the trial court’s denial of a motion to strike the school’s pleadings; the court’s failure to direct a verdict precluding any percentage of comparative negligence on the part of the parents; the court’s allowance of a $1.1 million setoff based on the separate settlement with the school principal; and the denial of a motion for additur for $537,009 in past services provided Gabriel by his parents. We find no abuse of discretion by the trial court regarding the first of these issues in the cross-appeal, and our decision in the main appeal renders moot the remaining issues.
 

 I.
 
 Background
 

 A.
 
 The “Praty” Invitation
 

 June 12, 2001, was the next-to-last day of school at the high school. During the day, the school administration became aware that various students had received copies of a card inviting them to an end-of-year party the following day at a residence several miles away from the school. Although the card itself carried a more unusual font and variations in the size of various words, the text read:
 

 A.M.L.P.P.
 

 ABC ONLY! ABC ONLY!
 

 WE PROMISED IT SINCE THE BEGINNING
 

 OF THE YEAR.NOW ITS HERE... COME
 

 END THE SCHOOL YEAR THE RIGHT WAY!
 

 PLACE: [Residence Address]
 

 TIME: 1:00 P.M. TILL IT ENDS
 

 RIGHT AFTER SCHOOL*BRING YOUR BATHING
 

 SUITS... $5.00 DOLLAS EVER-1, EXCEPT COMPS
 

 FOR INFO CALL: [Telephone Numbers]
 

 SPECIAL THANKS TO ANDY & RUDY.. SORRY BOUT THA PIC
 

 PRATY 6
 

 POOL PRATY XXX BIKINI CONTEST XXX ALL ACCESS
 

 Testimony at trial disclosed that “ABC” referred to Archbishop Carroll School; the residence address was that of two students at the school; the two telephone numbers were private numbers for those two students; the “Praty” was to begin an hour after students taking final exams were to be dismissed for the year from the school property (June 13, 2001); and “6” was a reference to prior student-organized, off-school premises “praties.” The cards were not prepared or distributed by the school, its faculty, or administration. Counsel for the appellees reported to the trial judge that “A.M.L.P.P.” was an extremely crude Spanish-language sexual reference, but there was no evidence that this reference was known by the school.
 

 The testimony and documentary evidence at trial also included a smaller “COMPPASS” (apparently, a free pass to
 
 *537
 
 the “praty”) also bearing the acronym “A.M.L.P.P.,” “ABC ONLY!” and “POOL PRATY.” On some of the invitations or passes, a bottle of liquor was faintly visible in the background.
 

 B.
 
 The “Skit”
 
 — “Bv,sting
 
 a Party!”
 

 On the morning before the party, the school principal had the two students (brothers) at whose home the party was to take place brought into his office so he could question them. He testified that the students told him that that their parents would be at the party as chaperones.
 

 The principal and school administrative staff also read a “skit” over the school public address system that morning. The principal composed the script, entitled “Busting a Party!” He testified that the skit was a parody intended to let students know that the administration had become aware of the party and might put a damper on it. The complete script (including typographical errors), an exhibit introduced into evidence at trial by the appel-lees, was:
 

 BUSTING A PARTY!
 

 Principal: Mr. [Staff 1]. Are you going to the party?
 

 Staff 1: What party?
 

 Principal: Come on, [Staff 1], get with it! You know that there is only one party happening this afternoon!
 

 Staff 1: Oh yes, I know! THAT Party! The ABC Party!
 

 Staff 2: Yes, that’s the one! It’s going to be really cool! Party! Pai*ty!
 

 Staff 1: [Staff 2], are you planning to be there?
 

 Staff 2: I most certainly am! I wouldn’t want to miss it for the world.
 

 Staff 3: I'll be there.
 

 Principal: You mean you plan to be there all of the party?
 

 Staff 2: Well, most of it! Did you guys get your bathing suits?
 

 Staff 1: Yes, I have one in the car.
 

 Principal: Me too. I can hardly wait. I’m gonna have [football coach] bring Ammo and Lisa too!
 

 Staff 1: Who is Ammo and Lisa!
 

 Principal: Ammo is [the coach’s] retired police dog. You know, the one that doesn’t like people! And Lisa is the dog that does body drug searches! You remember, the one that was at the bus when we took the juniors to Islands of Adventure!
 

 Staff 1: Oh yeah, now I remember. Gee, if they are there, this party could turn out to be a real bummer! Sounds like this might not be a real fun party after all!
 

 Staff 3: Really bad downer!
 

 Principal: Oh come on! We’ll really enjoy it! Wonder why it says $5 for ever one, except COPS! Does that mean the police will get in free?
 

 Staff 1: No, they meant COMPS. I guess that means us. Ha! Ha!
 

 Staff 2: I think we should invite the rest of the faculty! The invitation does say ABC ONLY! ABC ONLY! I think the faculty would enjoy this!
 

 Staff 4: Did someone say something about an ABC party? I’ll be there!
 

 Staff 2: If you students think we are kidding about going to this party, your are mistaken. We really do plan to go and see what is happening! If anything looks strange, we’ll have the necessary backup to make it un-hap-pen real quick!
 

 All: We’re gonna party! We’re gonna party! PARTY! PARTY!
 

 C.
 
 Dismissal; the Party; and the Principal’s Visit
 

 School was dismissed for the year following the second of two final exam periods, at 12:20 p.m. Students began to arrive
 
 *538
 
 at the home where the pai-ty was to take place after 1:00 or 1:30 p.m. The mother of the “hosting” students arrived at the home some time between 1:45 p.m. and 3:30 p.m., but went to her room by the pool and stayed there with the blinds drawn. She testified that after she was there 30 to 45 minutes, she called her husband to come home. Neither parent called the police or attempted to stop the party prior to the time Gabriel Maynoldi and his classmate drove away from the party.
 

 Alcohol was consumed in the pool area at the back of the house and in cars. Gabriel and his classmate, though minors, had obtained two twelve-packs of beer and a vodka drink from a convenience store and arrived at the party between 2:00 and 2:30 p.m. Gabriel and the classmate drank in Gabriel’s car for a half-hour to an hour, and then went into the party with whatever alcoholic drinks remained.
 

 At about 4:00 p.m., the principal and a school employee (who drove him to the residence) arrived at the party. The principal testified that he wanted to follow through on his threat to visit, that he wanted to personally see that things were okay, and that he confirmed from one of the students living at the home that his mother was home. After a few minutes, the principal and employee left and returned to the school. They did not notify police, visit the back of the home, call any parents (including the owners of the home at which the party was underway), consume or provide alcohol, participate in the party themselves, or direct any students to leave.
 

 D.
 
 The Accident
 

 Some 30 to 45 minutes after the principal and school employee left the home where the party was in progress, Gabriel and his friend got into Gabriel’s car and drove away. Several miles away from the party and from the school, the vehicle struck a tree (travelling in a residential area at a speed estimated by police to have been between 80 and 100 miles per hour) and split in half, killing the friend and catastrophically injuring Gabriel. Two hours after the accident, Gabriel had a blood alcohol level of ,09%.
 
 [3]
 
 He is now a quadriplegic, and he suffered traumatic brain injury as well.
 

 E.
 
 The School’s Parent and Student Handbook
 

 The School’s parent and student handbook for school year 2000-2001 was admitted into evidence. A section entitled “Outside (Home) Parties” states:
 

 This is our advice and recommendation. Parents should be positive that responsible adults properly supervise activities that their child attends. We recommend the parents call the hosting family to ensure the activity has been planned for their home and that they plan to chaperone the event. In advance, if the school becomes aware of any party that involves illegal or immoral activities we will inform the proper authorities. We would ask that any parent who learns of any such party or event contact the administration so we could help prevent any tragedy that might result. THE SCHOOL WILL NOT BE RESPONSIBLE FOR ANY EVENT THAT IS NOT OFFICIALLY SANCTIONED BY THE ADMINISTRATION. We also strongly discourage allowing students to stay out after any official function is completed, or to rent facilities after any function, especially a dance or prom.
 

 
 *539
 
 The handbook also contains a substance abuse policy applicable to alcoholic beverages proscribing the use or possession of such beverages “by any student on school property or while attending or participating in any school sponsored activity or at any time the student is wearing a school uniform.” The consequences of a violation were specified: “[t]ransgression of this rule will result in disciplinary action, which may include dismissal from school, even for a first offense.” Another section stated:
 

 The use, possession, or sale of alcoholic beverages or drugs is prohibited at all times on school premises before, during or after school hours or at school-sponsored events. ANY STUDENT WHO APPEARS TO HAVE CONSUMED ALCOHOLIC BEVERAGES, USED DRUGS, DISTRIBUTED DRUGS, OR ANY STUDENT WHO BRINGS SUCH SUBSTANCES ON THE SCHOOL PREMISES OR PLACE OF A SCHOOL SPONSORED FUNCTION IS SUBJECT TO DISMISSAL FROM SCHOOL, EVEN FOR A FIRST OFFENSE. The determination of “use” will by necessity be a judgmental decision by any staff or faculty member who may observe the behavior.
 

 Other sections addressed the rules applicable to field trips and required parental permission forms, approved clubs and extracurricular activities.
 

 F.
 
 The Circuit Court Case
 

 The appellees commenced the lawsuit in the trial court in September 2004. After substantial discovery and additional investigation, they amended the complaint. The third amended complaint named six defendants: the school (a non-profit Florida corporation), the religious diocese alleged to control the school, the principal of the school, the parents of the two students who hosted the party (owners of the residence at which the party took place), and the convenience store alleged to have sold the alcoholic beverages consumed by the underage students.
 

 Before and during trial, the appellees settled separately with the principal and dismissed all defendants other than the school and the diocese. During trial, the school sought admission of records from a local hospital’s addiction treatment center. The records pertained to Gabriel’s prior treatment for marijuana and alcohol abuse, and they had been ordered to be produced after careful in camera analysis by a general magistrate, a circuit judge, and this court.
 
 [4]
 
 The records and the deposition testimony of the addiction treatment center counselor who treated Gabriel established that Gabriel had been treated in 2000 and early 2001 for marijuana and alcohol abuse (including a self-reported consumption of 24 beers within a single 24-hour period), and that he and his family had been counseled on post-treatment care and avoiding situations where alcohol would be available. At trial, the court excluded this evidence, but allowed the school’s counsel to ask the parents whether they knew that “before the day of the accident” Gabriel had consumed alcohol.
 

 During trial, the court also struck the school’s affirmative defense based on section 768.86(2), Florida Statutes (2001). That statute provides:
 

 (2) In any civil action, a plaintiff may not recover any damages for loss or injury to his or her person or property if the trier of fact finds that, at the time the plaintiff was injured:
 

 (a) The plaintiff was under the influence of any alcoholic beverage or drug
 
 *540
 
 to the extent that the plaintiffs normal faculties were impaired or the plaintiff had a blood or breath alcohol level of 0.08 percent or higher; and (b) As a result of the influence of such alcoholic beverage or drug the plaintiff was more than 50 percent at fault for his or her own harm.
 

 The trial court accepted the appellees’ argument that the statute does not apply to a minor plaintiffs impairment and claim for damages, though no reported decision has reached such a conclusion. The court concluded that the injured student’s parents were the plaintiffs, not the student, so that the statute should not be applied.
 

 After motions by the school and diocese for directed verdict were denied, the jury rendered a verdict awarding over $55 million in damages, apportioning 53% of the negligence to Gabriel and his parents;
 
 [5]
 
 25% to the school; 20% to the parents at whose home the party took place; and 2% to the person who purchased alcohol for Gabriel and his classmate. Post-trial motions were filed and heard. The trial court allowed certain setoffs and ultimately entered an amended final judgment against the school and diocese for $12,950,197.50. The amended final judgment granted the appellees’ motion for sanctions for an unspecified “discovery violation” and reserved jurisdiction to consider an application to fix the amount of attorney’s fees and costs as an appropriate sanction.
 

 II.
 
 Analysis
 

 A.
 
 “School Sponsored or School Related”
 

 Concepcion
 
 and several other Florida cases establish appropriate legal standards for a school’s legal duties to students engaged in off-premises activities. Two primary standards have been articulated: a school’s on-premises duty of supervision may continue when an off-premises activity is “school sponsored” or “school related.” No view of the record in this case satisfies either test. The “sponsor” of an event, according to any dictionary and common usage, is one who pays for it or takes responsibility for it. No resources of the school were used to conduct the party in this case. High schools may be said to “sponsor” a prom away from the school premises, but the event is on official school calendars; faculty and staff ordinarily attend and chaperone; and the boundaries of liability are normally the boundaries of the school-sponsored venue.
 

 The broader standard, “school related,” requires some connection to the school’s academic and extracurricular programs. A school athletic team’s participation in a scheduled competition at another location is obviously “school related.” Similarly, in
 
 Rupp v. Bryant,
 
 417 So.2d 658 (Fla.1982), a school club’s off-premises meeting was held to be school related, subjecting the school to liability for negligence. In that case, the activity that caused a student’s tragic injury was officially prohibited by the school (a hazing ceremony). The school’s duty of supervision extended to the activity, however, because the club in question was officially sponsored by the school and the school had reserved to itself the authority to control the activities of the club.
 
 Id.,
 
 417 So.2d at 667.
 
 [6]
 

 
 *541
 
 In this ease, however, there was no “club” recognized, endorsed, or supervised in any way by the school. The off-premises activity was planned, hosted, and attended by a collection of students having no name, group identity known to the school, or school related purpose. Of the students attending, only two had been firmly identified (the students whose address was listed on the “praty” invitation) by the school, and those two had told the school that their parents would be present. The Wo student “hosts” did not ask for or obtain the school’s permission to conduct the event, and the academic school year was complete when the students left the school premises (before the event began).
 
 [7]
 

 A similar tragedy is recounted in
 
 Rhea v. Grandview School District No. JT 116-200,
 
 39 Wash.App. 557, 694 P.2d 666 (1985). A high school senior class met in the school gymnasium just before graduation. Before their faculty adviser joined the group, the students planned an off-campus party to be held on one of the “release” days when seniors were not required to attend school. When the faculty adviser learned that the students were planning to bring beer to the party, “the adviser admonished the students and reported the incident to the principal.”
 
 Id.
 
 at 667.
 

 One of the seniors attended the party consumed alcoholic beverages in the course of it, and was killed instantly in a collision while driving her car home. At the time of her death, the student’s blood alcohol level was .13 percent. In the ensuing lawsuit, the trial court granted summary judgment to the school district and the Washington Court of Appeals affirmed, despite the school principal’s and faculty adviser’s knowledge and inaction.
 
 Rhea
 
 followed other cases determining that “the nexus between an assertion of the school district’s authority and potential tort liability springs from the exercise or assumption of control and supervision over [a student] organization and its activities by the appropriate agents of the school district.”
 
 Id.
 
 at 668.
 

 In this case, there was no extracurricular or student “organization” over which the school or principal could have exercised control; concomitantly, there is no duty to do so.
 
 Rupp,
 
 417 So.2d at 666-67. Nor can the skit, “Busting a Party,” be considered sponsorship, endorsement, or recognition of any school related purpose. To the contrary, the use of the term “busting” in the introduction, and the concluding lines of the skit, convey disapproval.
 

 B.
 
 The Undertaker’s Doctrine
 

 The appellees also assert that the principal and school “undertook” duties that they breached. Florida’s common law “undertaker’s doctrine” is detailed in a recent decision by our Supreme Court,
 
 Wallace v. Dean,
 
 3 So.3d 1035 (Fla.2009). This “well-developed, entrenched aspect of Florida tort law” essentially follows sections 323, 324, and 324A of the Restatement (Second) of Torts (1965). 3 So.3d at 1051.
 

 The application of the doctrine to this case involves a series of separate inquiries. First, did the school undertake to render services to Gabriel Maynoldi and his parents regarding the off-premises “praty” which the school should have recognized as necessary for Gabriel’s protection? If so, and second, did the school fail to exercise reasonable care in rendering those ser
 
 *542
 
 vices? If so, and third, did the school’s failure to exercise such care increase the risk of harm to Gabriel
 
 or
 
 did Gabriel and his parents suffer harm because of their reliance on the school’s undertaking?
 

 We have already concluded, as the Washington Court of Appeals concluded in
 
 Rhea,
 
 that mere knowledge of the off-premises party is not a basis for liability. But in this case, two additional facts require consideration: the school handbook and the visit by the principal and an employee to the off-premises residence at which the party took place.
 

 With regard to the “Parent and School Handbook” section on “Outside (Home) Parties,” the appellees allege that the school undertook to notify “the proper legal authorities” because the school became aware, in advance, that the party “involves illegal or immoral activities.” Before this sentence, however, the handbook discusses the obligation of parents to be “positive that responsible adults properly supervise activities their child attends” and the recommendation that “the parents call the hosting family to ensure the activity has been planned for their home and that they plan to chaperone the event.” More significantly, the school disclaimed responsibility for unauthorized home parties in an all-capitalized disclaimer in the same section: “THE SCHOOL WILL NOT BE RESPONSIBLE FOR ANY EVENT THAT IS NOT OFFICIALLY SANCTIONED BY THE ADMINISTRATION.” The party in question was not officially sanctioned.
 

 Finally, the school’s policy in the handbook “does not change the fact that the incident occurred at a time when the school had no duty to supervise the students.”
 
 Matallana v. School Bd. of Miami-Dade County,
 
 838 So.2d 1191, 1192 (Fla. 3d DCA 2003).
 

 With regard to the visit to the off-premises party site by the principal and employee, neither of these visitors undertook a special duty to care for Gabriel. The principal and employee were not invitees of the owners of the residence, and they never spoke to the student hosts’ mother. They did not offer a ride to anyone, offer to call Gabriel’s parents, take his keys, or otherwise “render services” to Gabriel or his parents. Nor was Gabriel under these visitors’ authority, control, or supervision. School was out.
 

 These indisputable facts may be contrasted with the facts in the
 
 Wallace
 
 case. Ms. Wallace was the personal representative of the estate of her mother, who had died after falling into a diabetic coma in her home. The incident at the center of the lawsuit occurred several days before the death, when two sheriffs deputies responded to a 911 call to the mother’s home. Ms. Wallace, who lived out of state, had called a neighbor of her mother after numerous phone calls by Ms. Wallace to her mother went unanswered. The neighbor “repeatedly knocked on the doors and windows of the decedent’s home, and when she received no response, called 911.”
 
 [8]
 

 The deputies entered the home with the neighbor of Ms. Wallace’s mother and the neighbor’s father. They found Ms. Wallace’s mother on a couch, breathing but unresponsive. They openly discussed the possibility that the mother
 
 might be in
 
 a diabetic coma, and the neighbor suggested that they call an ambulance. The deputies did not call for medical assistance, suggesting instead that they would return to check on the mother later and that the
 
 *543
 
 neighbor should leave the mother’s door unlocked.
 

 After the deputies left, [the neighbor] called Ms. Wallace and told her that the decedent was sleeping. The next morning, [the neighbor] again found the decedent unresponsive, and once more called 911. Emergency medical personnel responded to the call and transported the decedent to the hospital where she died, several days later, without regaining consciousness.
 

 Wallace v. Dean,
 
 970 So.2d 864, 866 (Fla. 5th DCA 2007).
 

 Our Supreme Court applied the analysis embodied in sections 323-324A of the Restatement (Second) of Torts and concluded that “the officers
 
 either
 
 increased the risk of harm to the injured party
 
 or
 
 induced third parties — who would have otherwise rendered aid — to forbear from doing so.”
 
 Wallace,
 
 3 So.3d at 1040. In the present case, however, the school (including its principal and employee in their brief visit to the front of the residence where the party took place) did not increase the risk of harm to Gabriel or his parents, and did not induce any third party to forbear from assisting Gabriel or his parents. This conclusion is not based on a balancing of any evidence presented at trial; there is simply no record evidence that either of these elements of the undertaker’s doctrine existed. In
 
 Wallace,
 
 the deputies heard from the neighbor’s father the possibility that Ms. Wallace’s mother might be in a diabetic coma, and in response they (a) decided, as officials vested with authority in matters of public safety, that no emergency medical response was necessary, and (b) told the neighbor and her father that they would return to check up on Ms. Wallace’s mother.. These are rather classic examples of increasing risk and inducing reliance.
 

 In evaluating the special risks that are involved in the toxic combination of minors, residential open house parties, and alcoholic beverages, the legislature has not been silent. Parents and guardians are primarily responsible for the supervision of them minor children, of course.
 
 Machin v. Walgreen Co.,
 
 835 So.2d 284, 285 (Fla. 3d DCA 2002) (“parents have a constant and continuous duty as ordinary, prudent persons to watch over, supervise, and protect their children who are too young to exercise judgment to care for themselves.”);
 
 K.C. v. A.P.,
 
 577 So.2d 669, 671 (Fla. 3d DCA 1991). But in 1988, the legislature also enacted a special statute applicable to “open house parties” at which alcoholic beverages or drugs are consumed by minors. As in effect in 2001, the statute provided:
 

 No adult having control of any residence shall allow an open house party to take place at said residence if any alcoholic beverage or drug is possessed or consumed at said residence by any minor where the adult knows that an alcoholic beverage or drug is in the possession of or being consumed by a minor at said residence and where the adult fails to take reasonable steps to prevent the possession or consumption of the alcoholic beverage or drug.
 

 § 856.015(2), Fla. Stat. (2001).
 

 At the time of the off-campus party attended by Gabriel, the application of this criminal provision was well settled.
 
 See, e.g., Newsome v. Haffher,
 
 710 So.2d 184 (Fla. 1st DCA 1998) (describing the purpose and effect of the statute);
 
 Trainor v. Estate of Hansen,
 
 740 So.2d 1201 (Fla. 2d DCA 1999) (adult host set up kegs of beer outside his home for consumption by minor guests at his daughter’s 16th birthday, thereby exposing himself to both criminal and civil liability for the death of a passenger in a car driven by an intoxicated minor guest).
 

 
 *544
 
 In contrast to the well-established and statutory duty of the residence owners
 
 not
 
 to allow their sons to host a party where minors would be served alcohol, the school principal’s and employee’s legal rights to supervise attendees, or even to enter upon the residential property without the permission of the adult owners,
 
 [9]
 
 were non-existent. The principal’s lack of authority to issue directives to the student attendees at the residence is readily distinguishable from the authority of the uniformed deputies carrying out their appointed public safety duties in
 
 Wallace.
 

 Similarly, the principal and employee cannot be said to have induced third parties who might have otherwise rendered aid to Gabriel to forbear from doing so. On this record, no one was led to believe by the principal or the employee that a call to the police or to Gabriel’s parents, or taking away his keys, or offering to serve as a designated driver, was forbidden or a waste of time. The principal and employee did not undertake to “check back later,” whether for Gabriel or any other student.
 

 We decline, for these reasons, to apply the undertaker’s doctrine in a way that would effectively make a principal or the school an insurer if the principal stops by the site of a student open house party to ask whether a parent is present in the residence. This would, in the trite but apt phrase, let no good deed go unpunished.
 

 C.
 
 Alcohol Defense
 
 — Section
 
 768.36
 

 As noted, the trial court struck the school’s affirmative defense raising the bar of section 768.36, “alcohol or drug defense.” The applicability of the bar set forth in that statute raises two separate questions. First, does it bar Gabriel’s claim for damages based on the fact that, “at the time the plaintiff was injured ... .the plaintiff had a blood or breath alcohol level of .08 percent or higher; and [a]s a result of the influence of such alcoholic beverage or drug the plaintiff was more than 50 percent at fault for his or her own harm?” Second, does it in any way bar Gabriel’s parents’ claims for damages resulting from Gabriel’s injuries? The trial court held that the statute did not apply as a matter of law to this scenario because Gabriel was not the “plaintiff’ — his parents were the plaintiffs in their individual and representative capacities.
 

 In this case, it is undisputed that Gabriel’s blood alcohol level exceeded .08 percent some two hours after the single car crash. The fact that the accident was a single-vehicle, excessive speed crash strongly suggests that Gabriel’s actions and omissions were the immediate cause of the accident and injuries. The jury found' — albeit without instruction regarding the statute and without the important fact, discussed below, that Gabriel had a very significant and recent history of problems with alcohol before the accident — that the “plaintiffs” were responsible for 53% of the comparative, apportioned fault.
 

 In
 
 Griffis v. Wheeler,
 
 18 So.3d 2 (Fla. 1st DCA 2009), a personal representative brought a wrongful death action against the owner and operator of a vehicle that collided with the decedent’s vehicle. The evidence established that the decedent’s blood alcohol level exceeded .08 percent at the time of the accident. The defendants affirmatively defended on various grounds including section 768.36. The plaintiff moved to strike the statutory defense, arguing that it did not apply to a claim in which a personal representative, not the alcohol-impaired driver, brought the claim.
 

 The trial court and district court held, and we agree, that this “[statutory inter
 
 *545
 
 pretation cannot be stretched to an absurd result.”
 
 Id.
 
 at 3. Their application of the statute to the personal representative’s derivative claims apply with equal force to parents’ claims arising entirely from their minor child’s accident and injuries. The derivative claimant should not acquire greater rights than the decedent (or in this case, the minor) could ever have had, assuming the requirements of the statute as to blood alcohol and fault were met.
 

 But for our reversal on the issue of liability, the case would have been remanded for a new trial including consideration of the statutory affirmative defense.
 

 D.
 
 The Addiction Treatment Evidence
 

 Similarly, the trial court’s exclusion of the records and testimony relating to Gabriel’s significant and recent treatment for alcohol abuse was an abuse of discretion. The prior treatment and Gabriel’s admissions regarding his abuse of alcohol were directly relevant to, and probative of, the specific knowledge of the parents, their level of supervision of Gabriel, his access to a motor vehicle, and the jury’s allocation of comparative fault.
 
 Metropolitan Dade County v. Cox,
 
 453 So.2d 1171 (Fla. 3d DCA 1984). While it is certainly true that the proffered evidence is prejudicial to the appellees’ claims, that is no basis for refusing to allow the jury to consider it in this case. That evidentiary ruling would also require, were it not for our reversal as to liability, reversal and remand for a new trial.
 

 III.
 
 Conclusion
 

 No conscientious juror or judge could (or can now) feel anything but the deepest sympathy for the tragic results of Gabriel’s accident. But our legal system requires more than heartfelt sympathy and demonstrable damages as predicates for the compensation of injured persons. Although this case involves three novel aspects that were not considered in
 
 Concepcion
 
 — the school’s interception of the “praty” invitations and “skit” in response, the parent and student handbook provisions, and the visit by the principal and employee to the residence where the party was underway — we conclude that these circumstances were insufficient as a matter of law to impose upon the school a duty to supervise, or a duty under the undertaker’s doctrine, regarding Gabriel’s acquisition and consumption of alcohol, attendance at the party, and fatal decision to get behind the wheel.
 

 The amended final judgment below is reversed and remanded for the entry of judgment for the appellants. Upon remand, the trial court may also exercise the jurisdiction reserved in the amended final judgment with respect to an award of appropriate attorney’s fees and costs to the appellees as a sanction for the delayed production of certain discovery. On the cross-appeal, we affirm the trial court’s refusal to strike the appellants’ pleadings. The remaining points on cross-appeal are moot.
 

 Reversed and remanded, with directions.
 

 [1]
 

 .
 
 Concepcion v. Archdiocese of Miami,
 
 693 So.2d 1103, 1105 (Fla. 3d DCA 1997).
 

 [2]
 

 . The appellees also asserted that the school principal testified falsely on two collateral matters, further supporting sanctions. In view of the principal's separate settlement with the appellees (and the resultant stipulated dismissal), that aspect of the sanctions ruling is also moot.
 

 [3]
 

 . A blood alcohol level of .08% or higher subjects the vehicle operator to a criminal charge of driving under the influence; § 316.193, Fla. Slat. (2001). That level is also the critical threshold in section 768.36, Florida Statutes, barring a recovery of civil damages under certain circumstances (and discussed in greater detail below).
 

 [4]
 

 .
 
 Archbishop Coleman F. Carroll High School, Inc. v. Maynoldi,
 
 Case No. 3D08-247 (certio-rari granted Feb. 8, 2008).
 

 [5]
 

 . The verdict form allocated 25% of the total to Gabriel; 13% to his father; and 15% to his mother.
 

 [6]
 

 . The club in
 
 Rupp
 
 had a faculty adviser, and it was undisputed that the school had "authorized and sponsored” the club. Our Supreme Court recognized that high school service clubs “can have an important socializing benefit to students.”
 
 Rupp,
 
 417 So.2d at 667-68.
 

 [7]
 

 .
 
 Fernandez v. Florida National College, Inc.,
 
 925 So.2d 1096 (Fla. 3d DCA 2006), involved a tragic accident during an off-campus excursion to celebrate the end of the school year. A summary judgment for the college was affirmed because the teacher who drove the group did so in his individual capaciLy, after classes were officially concluded, and without authorization by the school.
 

 [8]
 

 .
 
 Wallace v. Dean,
 
 970 So.2d 864, 866 (Fla. 5th DCA 2007). This was the district court opinion reviewed by our Supreme Court in 2009.
 

 [9]
 

 . Unauthorized entry onto real property is a trespass.
 
 See Coddington v. Staab,
 
 716 So.2d 850, 851 (Fla. 4th DCA 1998).