# Third District Court of Appeal

## State of Florida

Opinion filed April 25, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D16-959
Lower Tribunal No. 13-32644

_____

**Christopher Sanchez,**
Appellant,

vs.

**Miami-Dade County,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Antonio Marin, Judge.

Beckham & Beckham and Pamela Beckham and Robert J. Beckham, Jr., for appellant.

Abigail Price-Williams, Miami-Dade County Attorney, and Joni A. Mosely and Sabrina Levin, Assistant County Attorneys, for appellee.

Before SUAREZ, SALTER and LUCK, JJ.

PER CURIAM.

Christopher Sanchez and Noel Pozos were shot while in Miami-Dade County's Benito Juarez Park attending a birthday party. In separate lawsuits before different trial court judges, Sanchez and Pozos sued the county because it

negligently failed to allocate off-duty police officers as security to protect the partygoers. The county moved for summary judgment in each case based on sovereign immunity under Florida Statutes section 768.28(9). The trial court in the Pozos case denied the county's summary judgment motion. We dismissed Pozos' appeal because the trial court's unelaborated denial did not determine as a matter of law that the county was not entitled to sovereign immunity. See Miami-Dade County v. Pozos, No. 3D15-2167, 2017 WL 621233, at *1 (Fla. 3d DCA Feb. 15, 2017) ("Because the trial court did not determine that, as a matter of law, the County was not entitled to sovereign immunity or immunity under section 768.28(9), Florida Statutes, the County was not authorized to appeal the trial court's order, and we therefore dismiss this appeal as one taken from a nonfinal, nonappealable order.").[1] Chief Judge Rothenberg dissented. She would have found that we had jurisdiction and the county was immune from Pozos' claim.

Unlike Pozos, the trial court in the Sanchez case granted the county's summary judgment motion, concluding that the county was immune under section 768.28(9). Sanchez has appealed, and because final summary judgment was entered in favor of the county, there is no jurisdictional issue as there was in Pozos. We have jurisdiction over final judgments. The issue here is the one left

---

[1] The motion for rehearing and rehearing en banc is pending in Pozos. The motion is directed to the jurisdictional issue, and does not affect Chief Judge Rothenberg's sovereign immunity discussion.

unanswered by the majority opinion in Pozos: whether the county's sovereign immunity barred Pozos and Sanchez's negligent security claims. We agree with and adopt the portion of Chief Judge Rothenberg's Pozos dissent concluding under the facts of this case that the county had sovereign immunity under section 768.28(9), and affirm the judgment in favor of the county.

## FACTUAL BACKGROUND

Chief Judge Rothenberg correctly described the summary judgment evidence.

> On August 24, 2012, Eli Salgado purchased a Miami-Dade County Park Foundation membership for $149. This membership included a coupon book containing several promotional items, including two tickets to the zoo, a 50% discount coupon for golf, and a coupon for the use of a park shelter without payment of the requisite rental fee. Along with Salgado's membership and the coupon booklet, Salgado was given a copy of the Park's rules and regulations to be followed when renting a facility at the Park. These rules contained a section regarding when permits and off-duty officers are required and provided notice to Salgado that it was his responsibility to obtain the correct permit(s) and to hire off-duty police officers under certain circumstances. For example, these rules provided that when a D.J., live music, or speakers are going to be used, the person renting the facility or hosting the event at the Park must obtain a broadcast permit and hire and pay for off-duty police officers. Depending on the type or size of the party or event, other permits are required, and again, Salgado must hire off-duty police officers to provide security for the event. Specifically, the rules and regulations provided that if Salgado was expecting over a certain number of guests, then he would be required to hire two off-duty police officers and obtain a special events permit. The rules and regulations additionally stated that the Park's employees would not be responsible for providing any of these items.

3

When Salgado rented a shelter at the Park for his September 22, 2012 birthday party, he simply asked to rent the shelter and used the free rental coupon contained in his membership coupon booklet. He did not advise anyone that he was going to hire a D.J., and he did not obtain any permits or hire any off-duty police officers. Instead, he procured two private security officers to provide security at the party.

The only Park employee present for this after-hours private party was Diogenes Martin, a part-time Park Service Aide, whose responsibilities were to clean the restrooms and the Park before and after an event and to keep the area clean and change the trash bags during the event. Also present was a teenage volunteer who was helping Martin that night. Victor Jenkins, the Goulds South Dade Zone Manager who is responsible for managing seventeen parks for Miami-Dade County Parks and Recreation, testified in his deposition that the County has only budgeted for twenty-seven park security officers to service all of the recreational facilities throughout the County. These officers are directed to mainly patrol the beaches and marinas on the weekends. Because the County does not provide security at these private parties and events, it requires the patron renting a park facility to contact the police department and hire off-duty officers for certain events.

Martin testified in his deposition that he performed his duties as required on the night of the party. He made sure the restrooms and area were clean, the trash was properly disposed of, and the trash bags were changed when the cans became full. He explained that Salgado was celebrating his eighteenth birthday, and the party consisted of mostly sixteen-to-eighteen-year-olds who were eating, dancing, and just having a good time. Salgado's parents were present, and there were also two large men wearing "Security" T-shirts present who appeared to be patrolling the area and providing security for the party. He did not see anyone using drugs, fighting, or having a confrontation with anyone. Everything was calm and everyone seemed to be having a good time when all of a sudden, at around 10:00 or 10:30 p.m., he heard shots fired. As soon as he realized that some of the kids had been shot, he called 911 and then called his supervisor.

Inga Portilla, a Park Manager, confirmed that Park Service Aides are only responsible for maintenance within the Park. They do

4

not provide security, do not check to see if the renter has obtained the required permits, are not trained in crime prevention, and are not authorized to "police" the area. She also confirmed that after Salgado paid his membership fee, a booklet was sent to his house containing the rental coupon and a copy of the Park's rules and regulations. These rules and regulations are also posted at the Park. Portilla explained that "once we rent the facility . . . we don't have anything to do with direct involvement of the parties," and that it was Salgado's responsibility to follow the rules, obtain the necessary permits, and hire off-duty police officers if he was having a party that required off-duty police officers, as "[w]e are not responsible for the party."

Pozos presented no evidence to refute any of the above referenced evidence. The affidavit/statement provided by Salgado, the renter and host of the party, does not refute the testimony of the park employees or the physical evidence. Salgado did not dispute that he had received a copy of the Park's rules and regulations related to rentals of the Park's facilities. He merely states that when he rented the pavilion he was not advised that he needed to hire off-duty officers and that he did not recall if anyone had asked him how many people he expected would be attending the party.

Id. at *10-11 (omissions and alterations in original) (emphasis removed).[2]

---

[2] The dissenting opinion says it is "puzzled" that we would quote Chief Judge Rothenberg's summary of the facts. So as not to leave anyone puzzled, we explain why. The plaintiffs in Pozos and this case were shot on the same night, at the same place, at the same party, at the same time, and were represented by the same attorneys, who have brought the same claim, and made the same arguments against summary judgment, relying on materially identical evidence. Where one of our colleagues has succinctly, accurately, and painstakingly laid out the relevant summary judgment evidence for the sovereign immunity issue, there is no need to reinvent the wheel when a perfectly round shiny new one was laying around for us to use. See United States v. Stevens, 994 So. 2d 1062, 1068 (Fla. 2008) ("While we could 'reinvent the wheel' and set out our own analysis as to the application of the principles of these sections to the circumstances alleged here, we acknowledge that we could not improve upon the district court's analysis. Because we agree with Judge Hurley's analysis, we adopt the portion of his order regarding the application of these sections to the certified question . . . ."). We couldn't have summarized the facts any better than Chief Judge Rothenberg did.

**DISCUSSION**

Chief Judge Rothenberg properly applied the summary judgment evidence to the principles of sovereign immunity articulated by the Florida Supreme Court.

> [E]ven where a duty is owed, sovereign immunity may bar an action for an alleged breach of that duty, see Pollock 882 So. 2d at 932-33; Henderson, 737 So. 2d at 535; Kaisner, 543 So. 2d at 734, because in Florida, "governmental immunity derives entirely from the doctrine of separation of powers, not from a duty of care or from any statutory basis." Kaisner, 543 So. 2d at 737.

> When addressing the test for determining when a governmental entity enjoys sovereign immunity, the Florida Supreme Court held "that the separation-of-powers provision present in article II, section 3 of the Florida Constitution requires that 'certain [quasi-legislative] policy-making, planning or judgmental governmental functions cannot be the subject of traditional tort liability.'" Wallace, 3 So. 3d at 1053 (quoting Commercial Carrier Corp. v. Indian River Cnty., 371 So. 2d 1010, 1020 (Fla. 1979)). On the other hand, decisions made at the operational level – decisions or actions implementing policy, planning, or judgmental governmental functions – generally do not enjoy sovereign immunity. Commercial Carrier, 371 So. 2d at 1021. "Planning level functions are generally interpreted to be those requiring basic policy decisions, while operational level functions are those that implement policy." Id. (footnote omitted).

> While nearly every endeavor involves some level of discretion, it is the governmental quasi-legislative discretion exercised at the policy-making or planning level which is protected from tort liability. Wallace, 3 So. 3d at 1053; Yamuni, 529 So. 2d at 260. Thus, in addition to the five basic principles identified by the Florida Supreme Court in Trianon, which have been listed at the beginning of this analysis, the Court recognized that "there were areas of government activity where orthodox tort liability stops and the act of governing begins, . . . as well as the distinct principle of law . . . which makes not actionable in tort certain judgmental decisions of governmental authorities which are inherent in the act of governing." Trianon, 468 So.2d at 918 (internal citations and quotation marks omitted). Further,

6

"certain discretionary governmental functions remain immune from tort liability . . . because certain functions of coordinate branches of government may not be subjected to scrutiny by judge or jury as to the wisdom of their performance." Id. (internal citations and quotation marks omitted). . . .

. . . .

[T]he unrefuted evidence supports the legal conclusion that the County made a discretionary policy/planning decision to allow patrons of its parks to rent its facilities for private parties or events. Relying on its legislative/permitting/licensing authority, the County enacted certain rules and regulations governing the rental and use of its parks and the park's facilities. Based on the County's limited resources, it exercised its discretion to assign only twenty-seven officers to the Parks and Recreation Department to service all of the parks, beaches, and County-owned recreational areas located throughout the county and to direct those officers to primarily patrol the public beaches and marinas on the weekends, rather than directing them to patrol and monitor private parties being held in public parks. The County, therefore, included certain restrictions and requirements within its enacted rules and regulations and rental agreements, which the party or event host was required to follow. Among other things, these rules and regulations required the renter to go to the police department and (1) obtain a broadcast permit if using a D.J., live music, or sound equipment; (2) obtain a special event permit if over 200 guests were expected to attend; and (3) hire off-duty police officers under each of these scenarios. The rules and regulations and the rental agreement specified that the County's park employees would not be responsible for the failure to meet any of these requirements.

When Salgado purchased his Park membership, he was sent a copy of these rules and regulations. Salgado, however, did not abide by these rules and regulations when he used his free coupon to rent a pavilion for his birthday party. Although he had a D.J. and sound equipment at the party, he did not obtain a broadcast permit or hire off-duty police officers from the police department. Whether he was additionally required to obtain a special event permit and hire off-duty police officers based on the number of guests he expected to attend is

7

unclear because the evidence does not reflect whether Salgado expected so many people to attend and whether there were more than 200 guests at the party. This issue is nevertheless irrelevant because, based on Salgado's use of a D.J. and sound equipment, he was required to hire two off-duty police officers anyway. However, instead of obtaining the necessary permit(s) and hiring off-duty police officers, Salgado hired two private-duty security officers. . . .

. . . .

Because the County's decisions were quasi-legislative discretionary policy or planning decisions it is sovereignly immune from suit and thus, it was entitled to summary judgment as a matter of law. This conclusion is supported by prior decisions from the Florida Supreme Court, this Court, and our sister courts.

For example, in Delgado v. City of Miami Beach, 518 So. 2d 968 (Fla. 3d DCA 1988), this Court affirmed the trial court's order granting the City of Miami Beach's motion for summary judgment after concluding that the City of Miami Beach was protected from liability under the doctrine of sovereign immunity as a matter of law. Delgado was injured when someone in the crowd ignited fireworks which struck and burned Delgado's leg while he was attending a concert and a fireworks display sponsored by the City of Miami Beach. Delgado claimed that the City of Miami Beach, which had sponsored the event, breached its duty by failing to prohibit the attendees from possessing and detonating their own fireworks. This Court, however, concluded that the City of Miami Beach's "actions fell within the planning-level, discretionary function of government, for which no liability attaches." Id. at 969. Specifically, this Court held that "[t]he manner in which a city, through its police officers, exercises discretionary authority to enforce compliance with the laws and protect the public safety, falls squarely within the city's power to govern. Accordingly, the city is protected under the doctrine of sovereign immunity." Id. (citing Trianon, Commercial Carrier, and other cases).

As in Delgado, the County's actions in the instant case – not assigning officers to patrol or be present at private parties or events held in its public parks, but to, instead, require those who rent its park

8

facilities to obtain permits and hire off-duty officers under certain circumstances – was a discretionary planning and/or policy decision. It was a governmental decision made in the exercise of its discretionary authority regarding the manner in which compliance and enforcement of the law and the protection of the public would be effectuated. How the County notified those who rented its park facilities of their obligations and responsibilities was also a planning/policy discretionary governmental decision. Because parks such as Benito Juarez Park were "un-manned" parks with only part-time maintenance employees in attendance, the County, in the exercise of its discretion, put into place a policy requiring the County to notify each individual who purchased a Park membership or rented a Park facility by providing him/her with a copy of the Park's rules and regulations. The unrefuted evidence in this case is that these rules and regulations were sent to the Salgado's home along with his coupon book after he purchased his Park membership. Because these decisions fell squarely within the County's power to govern, they are protected as a matter of law under the doctrine of sovereign immunity.

The decisions of the County regarding where and how to deploy its available manpower (sworn police officers) is a discretionary or planning function. And, as the Florida Supreme Court stated in Trianon, "under the constitutional doctrine of separation of powers, the judicial branch must not interfere with the discretionary functions of the legislative or executive branches of government absent a violation of constitutional or statutory rights." Trianon, 468 So. 2d at 918. "While sovereign immunity is a silent issue here, we ought not lose sight of the fact that inherent in the right to exercise police powers is the right to determine strategy and tactics for the deployment of those powers." Wong v. City of Miami, 237 So. 2d 132, 134 (Fla. 1970); see also Commercial Carrier, 371 So. 2d at 1020 (quoting Wong, 237 So. 2d at 134):

> The sovereign authorities ought to be left free to exercise their discretion and choose the tactics deemed appropriate without worry over possible allegations of negligence. Here officials thought it best to withdraw their officers. Who can say whether or not the damage sustained by petitioners would have been more widespread if the officers had stayed . . . .

<u>Pozos</u>, 2017 WL 621233, at *9-13 (some omissions and alterations in original).

We agree with and adopt Chief Judge Rothenberg's analysis as our own. We only add to her discussion to address two points in the dissenting opinion: (1) its discussion of Sanchez's claim; and (2) its reliance on <u>City of Belle Glade v. Woodson</u>, 731 So. 2d 797 (Fla. 4th DCA 1999).

1. Sanchez's Claim.

The dissenting opinion reads Sanchez's negligence claim to include violations of the park employees' operational duties to keep track of the number of party-goers, verify security measures, and shut down parties if they spiral out of control. The dissenting opinion says that Sanchez's claim does "not necessarily or simply involve policy decisions on the allocation of County-directed police officer," but rather includes operational decisions to issue permits, close the park after dark, and use warning signs.

*Response to Motion for Summary Judgment*. We read Sanchez's claim as he wrote and explained it. In his response to the county's summary judgment motion, Sanchez said he was "suing for negligent security." Sanchez argued that county procedures required "at least one off-duty police officer" at the party, and this set the standard of care for the county. Sanchez contended the summary judgment standard had been met "where there is expert evidence, the county admit[s] that there should have been at least one off-duty police officer to provide security at the

10

park, and the circumstances leading-up-to Sanchez's injury are established by proof."

*Hearing on Summary Judgment Motion.* At the hearing on the county's summary judgment motion, Sanchez described the factual basis for his claim this way:

> There was a police officer needed at this place and the County park zone manager testified that off-duty police were required to deter crime and for safety and to be proactive. . . . Instead, there was just one part-time park service aid and his unpaid friends with no security training.

*Initial Brief.* Sanchez reiterated in his initial brief that he "filed this negligence security action after he was shot during an event" at the park. "Sanchez sued for negligence security." Sanchez described his "security expert" as testifying "about the need for police at the event and the deterrent effect that police have." "At least two off-duty officers should have been providing security according to the security expert. The record shows that the attack was both foreseeable and preventable." In the fact section of his brief, Sanchez focused on the county's duty to provide off-duty police officers at the party, and the consequences to Sanchez and other party-goers by not providing them:

> The county's park manager admits that this event required at least one off-duty police officer to provide security. The county's zone manager agrees that the park managers and the county employee at this event know when off-duty police are required to provide security. However, there were no off-duty police officers providing security at the party.

11

Off-duty police officers provide much more effective security than private security guards who have no more authority than any ordinary citizen. The county acknowledges that off-duty police officers are needed to deter crime at park events and, "For safety and also to be proactive. When folks see officers they don't do the normal stuff."

*Reply Brief.* In his reply brief, Sanchez again told the court the nature of his claim. "Sanchez sued for negligent security," he wrote.

*Oral Argument.* At oral argument, the question about the scope of Sanchez's negligence claim was put to Sanchez's counsel. This is what he said:

| | |
|---|---|
| The court: | …. I'm trying to get to the heart of the claim. The negligence was not having off-duty police officers there, correct? |
| Counsel: | Say that again, you honor? |
| The court: | The negligence was not having off-duty police officers present at the party, correct? |
| Counsel: | Um, yes, your honor. . . . |
| The court: | …. Is that a fair summary of your claim? |
| Counsel: | Um, yes, your honor. . . . |

Sanchez's claim, as distilled by the time it got to this court, was not about failing to close the park by dark or having no-trespass signs. His claim was not about park employees violating their duties to keep track of party-goers and shut the party down after it got too large. Sanchez's claim was for negligent security. The county, according to Sanchez, was required to provide off-duty police officers at parties like this one, and did not. According to Sanchez's security expert, it was foreseeable that there would be criminal activity at the party, but it could have been avoided had the county provided the off-duty officers.

Sanchez's negligent security claim that the county failed to provide off-duty police officers must fail because the Florida Supreme Court and intermediate appellate courts have long held that a municipality's decision on where to allocate its police resources is a planning level decision that is not subject to civil liability. See Carter, 468 So. 2d at 957 ("The city has the right to set its priorities in reference to law enforcement."); Wong v. City of Miami, 237 So. 2d 132, 134 (Fla. 1970) ("[I]nherent in the right to exercise police powers is the right to determine strategy and tactics for the deployment of those powers. . . . The sovereign authorities ought to be left free to exercise their discretion and choose the tactics deemed appropriate without worry over possible allegations of negligence."); White v. City of Waldo, 659 So. 2d 707, 712 (Fla. 1st DCA 1995) ("Appellant cannot recover here on the theory that deputies should have been assigned to the area north of the City of Waldo or have been close enough by to reach the scene promptly. It was up to the sheriff's office to decide how to allocate limited resources. The dispatcher's inability to send help when requested reflects competing law enforcement needs. It was for the sheriff, not a jury, to assign priorities." (citation omitted)), cause dismissed sub nom. Hindery v. White, 666 So. 2d 901 (Fla. 1996); Ellmer v. City of St. Petersburg, 378 So. 2d 825, 827 (Fla. 2d DCA 1979) ("[W]e believe that the 'negligence' attributed to the city in this case falls within the scope of its discretionary planning level function. The alleged

failure to warn of riot conditions was but an aspect of the larger responsibility of providing police protection from the riot and restoring law and order to the city streets. . . . Decisions are also necessary concerning how to employ available manpower to effectuate the warnings while at the same time maintain sufficient forces to deal directly with the rioters and contain the spread of the riot to other areas of the community."); Higdon v. Metro. Dade Cty., 446 So. 2d 203, 208 (Fla. 3d DCA 1984) (same).

In Carter, a dog bit a child and severely injured him after escaping from private property. Carter, 468 So. 2d at 956. The city knew about the dog but did not enforce its dog control ordinance to impound the dog after prior biting complaints. Id. at 956-57. The boy's mother sued the city for negligence because the city knew about the dangerous dog, had inspectors on the payroll, but did nothing. Id. at 956. The Florida Supreme Court agreed that the city was immune because

> [a] government must have the flexibility to set enforcement priorities on its police power ordinances in line with its budgetary constraints. Without the ability to make such choices a government must either pay the high cost of total enforcement or forego the exercise of its police power. Neither option serves the public interest.
>
> Deciding which laws are proper and should be enacted is a legislative function. How and in what manner those laws are enforced is, in most instances, a judgmental decision of the executive branch. The judicial branch should not trespass into the decisional process of either. . . .

> . . . . The amount of resources and personnel to be committed to the enforcement of this ordinance was a policy decision of the city. The city has the right to set its priorities in reference to law enforcement.

Id. at 957.

Similarly, in Wong, neighborhood business owners were worried about violence overflowing from a nearby protest rally, and asked the city police to protect their businesses from rioting. Wong, 237 So. 2d at 133. The city police initially honored their request, but as the protest rally wore on, officers pulled out at the instruction of the sheriff. Id. The neighborhood stores were "plunder[ed]," resulting in $100,000 worth of damages. Id. The business owners sued the city because it knew about the protest and the likelihood of damages, and still it pulled its police officers. Id. The Supreme Court agreed that the city was immune because "at common law a governmental unit had no responsibility for damage inflicted upon citizens or property as a result of a riot . . . . [I]nherent in the right to exercise police powers is the right to determine strategy and tactics for the deployment of those powers." Id. at 133-34. [3]

---

[3] The dissenting opinion's fifth footnote, again, characterizes Sanchez's claim as the county's failure to "monitor and enforce the agreement between the Parks Department and the event sponsor." This is not Sanchez's claim. Sanchez's claim is exactly what he said it was in his trial court pleadings, appellate briefs, and oral arguments – he claims the county was negligent in securing Benito Juarez park because it knew about the party and still failed to have off-duty police officers. We have "assume[d]" nothing because we have relied on, and quoted extensively from, Sanchez's own words in describing his claim. (And not once in this opinion – not a single time – have we used the term "on-duty.")

Sanchez, and the dissenting opinion, would hold the county liable any time it

Here, it was undisputed that the county had allocated only twenty-seven officers to the parks department, and of those twenty-seven, they were assigned primarily to patrol the public beaches and marinas. As in Carter and Wong, the county made a strategic decision in allocating its law enforcement personnel to dedicate only a few dozen officers to its parks, rather than other high crime areas in the county, and to prioritize beach-and-marina parks over other ones. The county's decision to allocate its scarce law enforcement resources to one area of the county over another is the kind of discretionary, planning, and policy decision that is protected by sovereign immunity. To hold otherwise would be to require the county to allocate police officers to park birthday parties, to the exclusion of other high-crime or high-priority areas, or face millions of dollars in potential liability. Such a decision would violate the constitutional principle that policy-making, planning, and judgment calls by the government are reserved to the executive and legislative branches, and cannot be second-guessed and picked-over by the courts through traditional tort liability. See Wallace, 3 So. 3d at 1053 ("[T]he separation-of-powers provision present in article II, section 3 of the Florida Constitution requires that 'certain [quasi-legislative] policy-making, planning or judgmental

did not have law enforcement officers at a DJ'ed party at a county park. But Carter, Wong, White, Ellmer and Higdon hold that a municipality's decision on how to employ its law enforcement resources is a policy/planning decision that is entitled to sovereign immunity, and the failure to have officers on the scene where a crime occurs − even if it was foreseeable that a crime would occur − is not actionable.

16

governmental functions cannot be the subject of traditional tort liability.'" (alteration in original) (citation omitted)); Carter, 468 So. 2d at 957 ("How and in what manner those laws are enforced is, in most instances, a judgmental decision of the executive branch. The judicial branch should not trespass into the decisional process of either.").

## 2. City of Belle Glade v. Woodson

We also part from the dissenting opinion in its conclusion that this case is like Woodson. In Woodson, a shooting occurred at a city civic center "where a large crowd of youths had gathered to attend an unauthorized dance" and "the City knew from [] experience that such dances were dangerous events generally involving disorderly conduct." Woodson, 731 So. 2d at 797. The plaintiff sued the city for wrongful death and personal injury. The city argued that "enforcing the law and protecting public safety is a Category II governmental function" under Trianon; however, the Fourth District agreed with the plaintiff and found that maintaining and operating the civic center was a Category III function. Id. at 798. The court explained: "We agree with the plaintiffs that the City, in maintaining and operating the Civic Center, falls within the Trianon Park Category III. Thus, it does not enjoy sovereign immunity but rather has the same common law duty as a private person to properly maintain and operate the property." Id.

17

Woodson, for two reasons, does not apply here. First, the Woodson court conflated its discussion of duty with its determination of sovereign immunity. The Woodson court found that the municipal government was not immune because it had a duty to maintain and operate the civic center under Trianon. But the Florida Supreme Court has warned that one does not necessarily follow the other.

> [B]rief clarification is necessary concerning the differences between a lack of liability under established tort law and the presence of sovereign immunity. When addressing the issue of governmental liability under Florida law, we have repeatedly recognized that a duty analysis is conceptually distinct from any later inquiry regarding whether the governmental entity remains sovereignly immune from suit notwithstanding the legislative waiver present in section 768.28, Florida Statutes.

Wallace v. Dean, 3 So. 3d 1035, 1044 (Fla. 2009) (footnote omitted) (emphasis in original). The Trianon categories discussed by the Woodson court are "a 'rough,' general guide concerning the type of activities that either support or fail to support the recognition of a duty of care between a governmental actor and an alleged tort victim." Id. at 1047 (emphasis added) (citing Trianon, 468 So. 2d at 919). The Trianon categories do not, as the Woodson court decided they do, answer the sovereign immunity question. "[I]f a duty of care is owed, it must then be determined whether sovereign immunity bars an action for an alleged breach of that duty." Pollock v. Fla. Dep't of Highway Patrol, 882 So. 2d 928, 933 (Fla. 2004).

18

To determine whether a government function was entitled to sovereign immunity, we ask whether it was a policy-making planning or judgmental function, or an operational one. "[C]ertain [quasi-legislative] policy-making, planning or judgmental governmental functions cannot be the subject of traditional tort liability." Wallace, 3 So. 3d at 1053 (alteration in original) (quotation omitted). "Operational level functions, on the other hand, merely implement predetermined policy and may subject the government entity to tort liability." Carter, 468 So. 2d at 956.

The Woodson court, in the single paragraph discussing sovereign immunity, did not analyze whether the municipal government made a planning or operational decision after it found there was a duty. The court assumed there was no sovereign immunity because the city had a duty to operate and maintain the civic center. This was contrary to the Florida Supreme Court's instruction to review duty and sovereign immunity separately and independently, and therefore, the decision is unhelpful to the sovereign immunity question presented in this case.

Even if Woodson had separately analyzed the sovereign immunity issue, it would be unhelpful because the immunity question is different in this case. In Woodson, the municipal government knew there were parties at the civic center but did not authorize them and provided no security. The issue for the Woodson court was whether the municipal government was immune from liability even

19

though it knew about the unauthorized party, let it happen, and provided no security in any form for the safety of its known visitors.

This does not answer the far harder and narrower immunity question in this case. Here, the county authorized the party with the condition that the person throwing it had to provide security. Two security guards and a county parks employee were at the park the night of the shooting. Unlike in Woodson, the county did not ignore that there were parties in the park, and did not fail to provide security for partygoers. The issue here is not, as in Woodson, the failure to provide security altogether. Rather, the issue here is whether the county's failure to allocate off-duty police officers, in addition to requiring security as a condition of the permit and having security guards and a county employee at the party, was a planning (immune) or operational (not immune) decision. There was no evidence in Woodson, as there is here, that law-enforcement resources were scarce and the municipality had made a policy decision about the allocation of those resources. Whatever the single paragraph in Woodson said about sovereign immunity at the Belle Glade civic center, it did not decide the issue in this case.[4]

---

[4] The dissenting opinion also relies on our decisions in Prendes v. Miami-Dade County, 821 So. 2d 1196 (Fla. 3d DCA 2002), and Hill v. City of North Miami Beach, 613 So. 2d 1356 (Fla. 3d DCA 1993). But these are duty cases, and as the dissenting opinion points out, duty is not an issue here. See Prendes, 821 So. 2d at 1196 ("The summary judgment entered below for the defendant county is reversed for trial because the record presents genuine issues of material fact as to . . . whether the county owed and breached a duty to exercise due care to protect [the plaintiff] from reasonably foreseeable criminal attacks."); Hill, 613 So. 2d at 1357

20

**CONCLUSION**

This is a tragic case. Two young men were shot while attending a party. But nothing in our decision should be read as leaving Sanchez and Pozos without a remedy. The shooters, the party organizer, the security guards, and some others may be responsible for their negligent and willful actions. We conclude only that the county is shielded from liability for not allocating off-duty police officers, and only because it has sovereign immunity that protects its policy and planning decisions about where to allocate its limited police resources. The trial court correctly concluded the county was entitled to sovereign immunity, and we affirm the summary judgment in its favor.

Affirmed.

SUAREZ and LUCK, JJ., concur.

---

("We do not agree that the city had no duty to protect Hill."). This case deals with the more difficult question of whether the county's failure to provide off-duty police officers as security for the party was a planning/policy decision or an operational one. <u>Prendes</u> and <u>Hill</u> don't answer that sovereign immunity question.

SALTER, J. (dissenting).

I respectfully dissent.  Applying (1) our stringent, well-settled standard of review to the final summary judgment in favor of the County, and (2) the factual and legal prerequisites necessary to establish sovereign immunity for Miami-Dade County's operation of a park owned and operated by the County, I would reverse the final summary judgment and remand the case for further proceedings.

I.      Standard of Review

> Summary judgment should be exercised with special caution in negligence actions, and granted only when there is a complete absence of genuine issues of material fact. Holl v. Talcott, 191 So. 2d 40, 46 (Fla. 1966).  Nothing should remain to be resolved but questions of law. Moore v. Morris, 475 So. 2d 666 (Fla. 1985); Holl, 191 So. 2d at 46. If the record on appeal reveals the merest possibility of genuine issues of material fact, or even the slightest doubt in this respect, the summary judgment must be reversed.  Estate of Marimon ex rel. Falcon v. Florida Power & Light Co., 787 So. 2d 887, 890 (Fla. 3d DCA 2001) (stating the appellate court must consider the evidence in the light most favorable to the nonmoving party and must draw all competing inferences in favor of the nonmoving party).

Piedra v. City of North Bay Village, 193 So. 3d 48, 51 (Fla. 3d DCA 2016).

II.     Pertinent Summary Judgment Evidence

Though puzzled by the majority opinion's adoption of a statement of facts from the dissent in another case that is not yet final because it pends in this Court on a motion for rehearing en banc, I agree that some of the facts in the record in

22

the other case, <u>Miami-Dade County v. Pozos</u>, 42 Fla. L. Weekly D418 (Fla. 3d DCA Feb. 15, 2017), are duplicated in the record in the present case. But that is because Messrs. Pozos and Sanchez each were shot at the same park during the same party—not because the records and summary judgment evidence in the two cases were identical.

The fact is that each case was filed separately and decided by separate trial judges. Each of the two appeals is discrete and is before us on its own record. One trial court denied the County's motion for final summary judgment on the record before it (<u>Pozos</u>), and another trial court granted the County's motion for final summary judgment on the record before it (this case). The panel majority opinion in <u>Pozos</u> dismissed that appeal on procedural grounds, which allows the case to proceed to trial.

The summary judgment evidence before the trial court in this case also required denial of the County's motion for summary judgment. The pertinent facts in the summary judgment evidence are:

- The County owned and operated Benito Juarez Park on the date Sanchez was shot, Saturday, September 22, 2012. Using its "recreation management" software and facility rental rules, the County accepted payment for a parks foundation membership entitling an individual (not a party to this case or the <u>Pozos</u> case) to the use of a pavilion for an event for

between 75 to 100 persons for an evening birthday party for a young man turning 18. The County's parks employees emailed or otherwise delivered to the sponsor of the party a single-page, "Benito Juarez Park Facility Rental Additional Rules and Regulations."[5]

- The additional rules and regulations stated, consistent with Parks Department written policies, that personal disc jockey ("DJ") audio systems or hired DJs "are permitted in the shelter with a mandatory off-duty police officer present." Arrangements for the mandatory off-duty officer were required to be made "through Miami-Dade Police Hammocks Station #8 at [telephone number] for the time period of this entertainment. The rental office must receive a copy of the Miami-Dade Police Station #8 off-duty police permit prior to the event. These officers are responsible for crowd control, parking, and rules enforcement."

- The party sponsor did not obtain the DJ "broadcast permit" or obtain an off-duty police permit prior to the event, but County Parks Department employees allowed the party to include a DJ, strobe and laser lighting, a stripper pole, and (by witness estimates) some 200 party-goers as the event actually took place. No Parks Department employee or off-duty police

---

[5] The lines provided for the sponsor's signature and the date were not completed. The written rules at the time did not limit, or include a space for the sponsor to designate, the number of persons expected to attend.

24

officer intervened to rein in the number of participants, underage drinking, or illegal drug use.

- The Park and adjoining areas had been the site of prior gang incidents and violent crimes. As the number of birthday party participants grew during the event, disputes arose among some of the partygoers. Messrs. Sanchez and Pozos were wounded by gunfire while attending the party; Mr. Sanchez testified that he was shot for trying to help another party attendee "who got jumped" by others. The record contains no evidence that Mr. Sanchez carried or used a weapon himself, or that he struck anyone.

- After the shootings, the Parks Department revised its written reservation agreements for Park facilities, cut the mandatory closing time for events at Benito Juarez Park from midnight back to 10:00 p.m., and enforced its off-duty police officer regulations for parties.[6]

- Mr. Sanchez filed the deposition testimony of his security expert, West Palm Beach Police Lieutenant David Howard, and three pages of

---

[6] During the depositions of the Parks Department employees who described the changes in policy and practices in the aftermath of the shootings, the County objected to the testimony on grounds of "subsequent remedial measures." The deposition transcript was filed without any ruling on that objection, apparently made under section 90.407, Florida Statutes (2014). Recognizing the exceptions to that rule of inadmissibility, and without ruling on the objection, the Park employees' testimony on this point is a part of the summary judgment evidence filed by Mr. Sanchez in opposition to the County's motion, even if considered only to demonstrate the Parks Department's degree of control over the premises and the Park's operations.

handwritten notes (in lieu of a formal or final written report) prepared by Lt. Howard, as well as criminal incident reports involving the Park and surrounding area. The County moved to strike Lt. Howard's testimony on various grounds, including the asserted non-compliance with section 90.702, Florida Statutes (2014), and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), but the trial court expressly deferred that challenge during the hearing on the motion for summary judgment.[7]

- Lt. Howard's testimony and his notes include crime data indicating that the area had a crime rate six times the County average, including known gang activity. He considered the fight and subsequent shootings foreseeable and preventable. Had the Parks Department employees required the party plans to be submitted to the police as required, Lt. Howard concluded that a minimum of two off-duty officers would have been required, and that the unarmed fight that sparked the subsequent gunfire could have been stopped by the off-duty officers before it escalated. After reviewing the testimony

---

[7] The trial court stated that a separate hearing and detailed direct and cross-examination of Lt. Howard would be required to evaluate his qualifications and opinion. Nevertheless, the order submitted to the trial court by counsel for the County—signed by the trial court—states that the testimony is not admissible for reasons including Lt. Howard's lack of a doctorate and his failure to pass police exams for advancement at some earlier point in his career. This error alone, committed not by the trial court but by the overenthusiastic draftsmanship of the County's counsel, warrants reversal.

of the part-time park aides in the Benito Juarez Park at the time of the party and shootings, Lt. Howard concluded that they were unsupervised and not sufficiently trained in communications with law enforcement and in restricting underage drinking and drug use.

III.    Analysis—Sovereign Immunity

"In cases involving governmental tort liability, we generally determine whether the defendant owes a duty of care to the plaintiff before we address whether the governmental entity is immune from liability." Breaux v. City of Miami Beach, 899 So. 2d 1059, 1063 (Fla. 2005). In the present case, it is clear that the County's ownership and control of the Park subjects it to the "same common law duty as a private person to properly maintain and operate the property." Trianon Park Condo. Ass'n v. City of Hialeah, 468 So. 2d 912, 921 (Fla. 1985) ("Trianon"). A private owner of a facility such as the Park would have a duty of care to invitees to properly maintain and operate that facility.

After confirming that the County owed a common law owner and operator's duty of care to invitees at the Park, we consider whether the County's activity is nonetheless immune from liability based on the classification of the County's functions and activities under Trianon and the summary judgment evidence before the trial court. Trianon established four categories of governmental functions and activities: "(I) legislative, permitting, licensing, and

27

executive officer functions; (II) enforcement of laws and the protection of the public safety; (III) capital improvements and property control operations; and (IV) providing professional, educational, and general services for the health and welfare of the citizens." Trianon, 468 So. 2d at 919.

The County argues, and persuaded the trial court to find, that the County's functions and activities at the Park involved the discretionary allocation of law enforcement resources and that it was thus sovereignly immune, citing the concurring opinion in Ameijeiras v. Metropolitan Dade County, 534 So. 2d 812, 814 (Fla. 3d DCA 1988): "Protection of the public against third party criminal attacks on public parkland is an inherently governmental function for which there has never been a common law duty of care." (Jorgenson, J., specially concurring) (citing Trianon). The County's reliance on Ameijeiras is flawed, however, as (a) that quotation is in a specially concurring opinion that was not joined by the majority which decided the case, (b) the majority's holding found that the County was entitled to summary judgment "because, as a matter of law, the attack was not foreseeable," 534 So. 2d at 814 and n.1,[8] implying that the majority stopped its analysis after deciding there was no duty to that plaintiff, and (c) the Florida

---

[8] The majority opinion in Ameijeiras relied on a record in which no violent crimes had been reported in the past two years in the County park in which the attempted robbery in that case occurred. 534 So. 2d at 813. In the present case, Sanchez's summary judgment evidence included records of numerous prior criminal attacks and gang activity in the park and nearby area during the preceding three years, such that a jury might conclude that the attack was foreseeable.

28

Supreme Court subsequently clarified a governmental entity's "operational-level duty of care" in such cases as <u>Breaux</u>.

And were the County's analysis based on <u>Ameijeiras</u> current or correct, the County's common law duty of care to invitees, as the owner and operator of parks and other recreational facilities for County citizens, would be rendered entirely nugatory, contrary to the teaching of <u>Trianon</u> regarding property control operations. Under the County's analysis, apparently, any matter involving the security of invitees on County-owned, County-maintained, and County-operated property could be argued to be an inherently governmental function implicating the discretionary allocation of law enforcement resources.

The issue in the present case does not necessarily or simply involve policy decisions on the allocation of <u>County-directed</u> police officers. The issuance of permits with requirements that the sponsor of a night-time event at the park provide <u>off-duty</u> police or other security personnel (and monitoring to enforce the event sponsor's obligations); the closure of a park after dark and the use of warning or no trespassing signs; or other operational measures, could warn or protect invitees and address the known risks.[9]

---

[9]  In recounting Sanchez's pleadings and legal position, the majority opinion assumes that the deployment of on-duty police officers by the County Police Department is equivalent to the Parks Department's obligation to monitor and enforce the agreement between the Parks Department and the event sponsor. The Parks Department required the event sponsor to retain and pay for <u>off-duty</u> officers for an event of the kind involved in this case. This distinguishes the present case

29

For these reasons, the County's functions and activities regarding the Park, based on the known operational challenges, plainly constitute "property control operations" within Category III of the Trianon decision, and are not sovereignly immune, on the record (and summary judgment standard of review) presented here. This characterization aligns with that of the Fourth District as it considered the liability of a municipality when a "suit for wrongful death arose out of a shooting which occurred on the premises of the City of Belle Glade's Municipal Civic Center where a large crowd of youths had gathered to attend an unauthorized dance." City of Belle Glade v. Woodson, 731 So. 2d 797, 797 (Fla. 4th DCA 1999) ("Woodson"). The municipality was not alleged to be liable for a failure of the police regarding the shooting; rather, the City's Civic Center employees breached their duty to properly operate the Civic Center.

The Fourth District rejected the municipality's argument, identical to the County's argument asserted here, that the City was immune because "enforcing the law and protecting public safety is a Category II governmental function as analyzed in [Trianon] for which the City has sovereign immunity as a matter of

_____

from those relied upon by the majority involving claims for alleged negligence in the deployment of on-duty police. I respectfully disagree with the majority's assessment that this distinction is immaterial. Similarly, the deployment of on-duty Parks Department security officers is not at issue. Mr. Sanchez's use of the term "off-duty police officers" makes that clear. That is the term used so frequently in the allegations and evidence relating to the Park's Department's failure to monitor and enforce the event sponsor's contractual and operational obligation.

30

law." Id. Instead, the Fourth District held in Woodson that "the City, in maintaining and operating the Civic Center, falls within the Trianon Park category III. Thus it does not enjoy sovereign immunity but has the same common law duty as a private person to properly maintain and operate the property." Id. at 798. This Court's precedent, as well, has held that a municipality has a common law duty to operate a park and recreational facility to keep the facility safe from known dangerous conditions and that, for purposes of summary judgment in the case, foreseeability (based on prior incidents and notice) is a genuine issue of material fact. Hill v. City of North Miami Beach, 613 So. 2d 1356 (Fla. 3d DCA 1993).

Based on these authorities, the record before us, and the summary judgment standard of review, the final summary judgment in favor of the County should be reversed.

IV.   Wallace v. Dean

The majority opinion, relying again on the analysis in the dissenting opinion in Pozos, sees further support for the County's sovereign immunity claim in Wallace v. Dean, 3 So. 3d 1035 (Fla. 2009). After establishing duty (which the majority and County do not dispute), Mr. Sanchez must answer the question: was the County engaging in a policy-making planning or judgmental function, or an operational one?

31

In advancing this argument, the majority accepts the County's flawed premise in this case—that the County's breaches of duty alleged by Sanchez pertain to the discretionary and planning functions of allocating law enforcement resources. That is simply not the case, as the complaint makes clear. The alleged breaches of duty occurred in the operational activities of the Parks Department in day-to-day administration of a public park. Security was required to be procured (and paid for) by the event sponsor, via off-duty police officers.

The near-fatal errors culminating in the shootings at Benito Juarez Park occurred, it is alleged, because a landowner's on-site, operational employees[10] failed to carry out their assigned operational duties. Those duties included attention to the number of anticipated party-goers (and then to the number actually attending) the special event; verification that the required off-duty police were in place before the event commenced; and notifying the event sponsor, the off-duty police hired for the event, and the appropriate Parks Department managers, so that the event could be shut down when it spiraled out of control.

Here, as in Prendes v. Miami-Dade County, 821 So. 2d 1196, 1196 (Fla. 3d DCA 2002), the summary judgment should be reversed so that a jury can determine whether the County breached a duty to exercise due care to protect Mr.

---

[10] Mr. Sanchez's summary judgment evidence included deposition testimony from five Parks Department employees involved in the operation and supervision of the Benito Juarez Park at the time of the shootings.

Sanchez from "reasonably foreseeable criminal attacks." Mr. Sanchez has not conflated the County's duty as a landowner with its determination of sovereign immunity. In this case, like Woodson, the County's duty as a property owner required it to properly "maintain and operate" the property where the shootings occurred. Those operational obligations answer the question posed by Trianon and Wallace: the Parks Department's functions in this case were "operational" rather than "policy-making, planning or judgmental" in character.

V.    Other Issues

The County raises a series of additional arguments in defense of the summary judgment. Two are simply variations on its claim of sovereign immunity: that the deployment of security or police is a discretionary function immune from suit; and that reversal would make the County an insurer of park patrons and invade a Category II function under Trianon. These arguments are unpersuasive in light of the previous analysis and Trianon itself.

The County also argues that the attack on Sanchez was unforeseeable, that any duty of care on the part of the County was met; and that the intervening acts of the third-party attacker exculpate the County from liability. On the record before us, each of these issues presents a question for resolution by the trier of fact rather than summary disposition.

The County's proposed omnibus order granting summary judgment was

signed without amendment by the trial court. That practice is not uncommon, and we have often affirmed such judgments despite an opposing party's criticism of a judgment on that basis. See, e.g., Empire World Towers, LLC v. CDR Creances, S.A.S., 89 So. 3d 1034, 1045 (Fla. 3d DCA 2012). But in the order under review in the present case, contrast Lt. Howard's testimony and exhibits with this determination in the order: "The Court finds as well as a matter of law this crime was not foreseeable," [11] and contrast the trial court's pronouncement that it would not conduct a Daubert hearing on Lt. Howard's proffered testimony (see supra n.3) with the County's inclusion in the proposed order of a finding that "his deposition is not admissible evidence that can be considered."[12] These attorney-authored "findings" require reversal.

VI.     Conclusion

The order granting summary judgment and final judgment to the County should be reversed. Here, as the trial court ruled in Pozos, there are genuine issues of material fact precluding summary judgment. For the reasons set forth in this opinion, I respectfully dissent.

---

[11]   Omnibus Order Granting Defendant's Motion for Summary Judgment at 3, Sanchez v. Miami-Dade County, Case No. 13-32644-CA-11 (Fla. 11th Cir. Ct. Oct. 6, 2015).

[12]   Id. (emphasis in original).